671 S.E.2d 107

**The STATE, Respondent,**

v.

**Bruce E. KIRTON, Appellant.**

**No. 4470.**

Court of Appeals of South Carolina.

Heard Dec. 11, 2008.
Decided Dec. 17, 2008.

8

12

Deputy Chief Appellate Defender Wanda H. Carter, of Columbia, for appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, and Assistant Attorney General William M. Blitch, Jr., all of Columbia; and Solicitor J. Gregory Hembree, of Conway, for respondent.

ANDERSON, J.:

Bruce Kirton (Kirton) appeals his conviction for criminal sexual conduct with a minor in the second degree. We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

Bruce Kirton was convicted of criminal sexual conduct with a minor in the second degree and sentenced to twelve years in prison. The indictment alleged:

That Bruce Edward Kirton did in Georgetown County on or between December 1, 2005 and February 21, 2006 engage in sexual battery with a victim at least eleven years of age but less than fourteen, [Victim,] to wit: the defendant did have sexual intercourse with the victim, [Victim,] whose date of birth is [1992]. This is in violation of Section 16–3–0655(2), *S.C.Code of Laws,* 1976, as amended.

The thirteen year old victim (Victim) answered the assistant solicitor's questions on direct examination:

Q: When was the first time that you remember that [Kirton] touched your private parts?

A: When we were living in the trailer, and me and him were laying on his bed watching tv.

Q: Okay.

And, um, where—how old were you?

A: Six or seven.

Q: Okay.

Do you remember what grade you were in?

A: Second or third.

Q: Okay.

And, um, where did he touch you?

A: He just, like, touched my boobs and made me touch his penis.

Q: Okay.

And do you remember if you had your clothes on or off?

A: I don't remember.

Q: Okay.

And what about him? Did he have his clothes—his pants on?

14

A: He had a pair of boxers on.

Q: And did you touch his penis on the outside or the inside of his boxers?

A: The inside.

Q: Okay.

And how did that happen? Did he pull his pants down or how did—do you remember?

A: He took my hand.

Q: He—

A: He took my hand.

Q: Okay.

And he did what with you hand?

A: He pulled it into his boxers.

Q: Inside his boxers?

And is that the only time anything like that ever happened to you?

A: No.

Q: Um, so when—so this was six or seven years ago. Is that right?

A: Yes, sir.

Q: And you were about six years old?

A: Yes, sir.

Q: Do you remember about how many times that type of thing happened?

A: No, sir.

Q: Okay.

How often did it happen?

A: A couple of times a month, I guess.

Q: And, um, for the next few years up until, um, the last year or so, was it the thing that happened a couple of times a month, was that all the same or was it different?

A: I don't know.

Q: Okay.

What kind of things did he do to you a couple of times a month?

A: Just making me touch his penis and he touched me.

Q: Okay.

Where did he touch you?

A: On my crotch and my boobs.

Q: Okay.

And, ah, do you know when the first time was when he touched you in your crotch?

A: No, sir.

Q: Alright.

Do you remember about how long it was?

A: No, sir.

Q: Was it more than a year ago or less than a year ago?

A: It was probably more than a year ago.

Q: And did he ever—what did he touch your—the first time he touched you in your crotch, what did—what did he touch you with? What body part of his?

A: His hand.

Q: Okay.

And—and you say that was probably more than a year ago?

A: Yes, sir.

Q: And then did he ever touch your crotch with any part of his body?

Let me ask you this. You said it happened a couple of times a month. Right?

A: Yes, sir.

Q: And was there ever a time when he either didn't do it or didn't do it as much?

A: When he first started dating Lisa.

. . .

Q: Okay.

Tell me—tell me what happened the last times.

A: I don't remember the first one that well but the last time was two or three days before Christmas, and I was laying on the couch because I had spent the night with him, and he came in the living room and took my pants off and—put his penis in my crotch.

Q: Who—where did that take place?

A: His house in the living room.

Q: And did you say you were on the couch?

A: Yes, sir.

. . .

Q: I said were you—you were laying on the couch before he came in, and I was about to ask the question.

Which is, um, when he inserted his penis into your crotch, were you—was he on—how were y'all positioned on the couch?

A: I was laying down, and he was on his knees.

. . .

Q: How does it—how did that make you feel?

A: Upset.

. . .

Q: And did you tell anybody right away after that? Did you tell anybody right away after that happened?

A: No, not right away.

Q: And why not?

A: I just didn't want anybody to know.

Q: Were you embarrassed?

A: Yes.

Q: Okay.

Were you afraid?

A: Yes.

. . .

Q: Did he say anything to you about what would happen if you told?

A: He just told me if I told I'd never get to see him again.

. . .

Q: Okay.

And you told your mom, and then after that, did you go to see a lady named Dr. Carol Rahter?

A: I think so.

Q: Okay.

And did you tell her basically what happened?

A: Yes, sir.

. . .

Q: When [Kirton] put his penis in your crotch, did he put it inside your vagina?

A: Yes, sir.

. . .

Dr. Carol Ann Rahter conducted a forensic interview with Victim on March 2, 2006. The forensic interview consisted of a one-on-one conversation lasting approximately thirty minutes followed by a medical examination. Dr. Rahter advised the purpose of a forensic interview of a child victim of sexual assault is to determine what happened to the child to ascertain (1) what kind of medical treatment is needed and (2) whether it is safe for the child to return to his or her environment. Dr. Rahter has conducted over a thousand forensic interviews with child victims of sexual assault since 1993. Dr. Rahter asserted on direct examination:

Q: In your opinion did [Victim] appear to be competent?

A: Yes, she was competent.

Q: And, um, what, if anything, did she relate to you about the time frame of the sexual assault?

A: She has difficulty with age because she told me that the first time it happened she was seven, that that was either second grade, third grade or fourth grade.

Now, we all know that when you're about seven, you're about—you're either in first grade depending on your birthday or second grade. You're not in fourth grade.

Um, so that was—she has a little difficulty with time.

That's when she said the first time happened.

She told me that the last time happened approximately or about—I think she used the word "about" four weekends before.

And—

Q: What is the concept of delayed reporting? What does that mean?

A: The majority of children do not report at the time of any kind of sexual abuse. There's many reasons for that. . . .

. . .

Q: Now, um, how does that impact the child—the delayed reporting, how does that impact the child's ability to be specific with respect to dates of the assault?

A: My experience with children reporting dates is unless it's something that happened on their birthday or Christmas or something that's very impactual [sic] in a child's life, they can't tell you the date.

I mean, I've got a teenager. She can't tell you the date of anything.

It's just they're not small adults. They're children, and their time frames are not the same as adults. They don't write checks. They don't know—write dates down all the time, and so frequently children will tell me, "It happened a lot of times."

And when I'll say to them, "Does that mean less than five or more than five?"

They'll say, "More than five."

But they can't tell me how many times.

But when you go on and interview them, they'll end up saying that it happened every weekend over a three year period of time.

Well, then, obviously, that's a lot more than five.

They have a lot of difficulty quantitating [sic] and telling specifics about dates.

They can tell nighttime and daytime. They can sometimes tell you it was before Christmas or after Christmas or, "It was before my birthday or after my birthday," or it was in the summertime and school was not going on but they have a lot of difficulty telling me a specific date, a specific month, specific quantities of the times—of how many times something occurs to them.

Also, when there is an extended period of time where children have been assaulted, a lot of that blends together. So sometimes they'll report something that was actually several different incidents as if it was all in one day, and so sometimes it doesn't—it just doesn't make logical sense the way they're reporting but that's just what we see. They blend things, and so it's not—sometimes it doesn't make logical sense with dating and reporting.

Q: And as in the case of [Victim,] somebody a child has assaulted at the time that you're seven—if they are seven until the time that they are twelve or thirteen, um, how

would that impact their ability to be specific with respect to the nature of their assaults?

A: Well, the same thing. When it happens multiple times, they tend to blend—the way—the things that they can tell oftentimes, like, if it's a different location they'll be able to tell different things that occurred to them physically which is usually a grooming process, what starts out being something that's non-painful and ends up progressing to something that's more, um, ah, aggressive and oftentimes painful. Over a period of time that occurs.

So they can oftentimes tell you specific about when things transitioned, when different acts started occurring to them, and oftentimes, they can tell you more specific detail if it was something like it always happened in the house but one time it happened in their car on the way to Wal–Mart. But when the assaults are occurring in the same setting, they're very blended together, especially if it happens over a number of years.

So, oftentimes, they might be saying something that happened when they were seven and also blending it with something that happened when they were nine and then something that happened when they were eleven because that's just the way their memories are of the sexual abuse.

Q: Did you, ah, conduct a physical examination of [Victim]?

A: I did.

. . .

Q: With the disclosure of children, ah, do they always fully disclose the first time you talk to them?

A: It is very rare to fully disclose the first time. Kids disclose in a piece-meal fashion, and the only time there's a big exception to that is when it's a one-time incident and they disclose right away. But even then some of the details don't come out right after that happens. They may a week later tell something else they remember, um, about what the guy was wearing or what something looked like or whatever.

So, it's very rare to get a full disclosure which is why we try to refer all these children to counseling so that they can build a rapport with a counselor and have ongoing counseling to not only work through these things but oftentimes

they're able to—they're more comfortable in that setting when they've had multiple sessions with somebody to disclose more.

This is a forensic interview. You see them one time. You don't have a rapport that you've built up with them over a number of weeks or months.

So it would be very rare to get a full disclosure in the first interview.

Q: And would it surprise if different details were given at different times to different people?

A: No.

Q: Why is that?

A: Because that's what happens. That's the norm.

Q: Does that happen more often than not?

A: Correct.

Q: So, ah, getting back to the physical exam, when—did you say when you conducted the physical exam?

A: Yes, right after the interview.

. . .

Q: What were your findings?

A: . . .

In her case, her hymen was redundant and estrogenized meaning it was like the scrunchy. Estrogrenized means it was thickened, and there was a complete transection noted at seven o'clock.

We look at the hymen like a clock. Six o'clock is down here. Twelve o'clock is up here.

So at seven o'clock she had a complete transection of her hymen which was healed. You know, it wasn't bleeding or anything at the time but, obviously, there had been a penetrating injury there that had caused a transection to her hymen, and when it healed, it did not heal back together. So there's a permanent transection there at seven o'clock.

Q: What kind of object would cause that type of injury?

A: When you see a transection, you don't know what object. All you know is it's a penetrating injury to the hymen.

It could be a penis. It could be a foreign object. It could be digital penetration with a finger. You don't know by looking at the injury what caused the injury.

Q: Um, so that doesn't differ in every case. In every case it's not possible for you to say who the perpetrator is. Is that true?

A: Correct.

Q: You can just say whether there is physical evidence to indicate penetration. Is that right?

A: Correct.

Q: Would it be, ah, likely that the injury to the hymen was caused by the victim herself?

A: No.

Q: Why is that?

A: Because research and studies have shown that even in severely mentally retarded children, they don't injure their own hymen, and the reason is because the hymen is very sensitive in children, painful to touch.

So, and even if all children masturbate even in extremely mentally retarded children, they don't touch the hymen because when they touch it, it hurts, and they stop touching it. So they don't cause injury to their own hymen.

Um, the same thing with tampons don't cause injuries to hymens. Injuries to hymen occur by something that's forceful penetrating the hymen, and so you don't get those injuries from self, ah, stimulation.

Q: Were your findings, ah, you said—you say your findings were diagnostic of sexual assault?

A: Yeah, the penetrating injury to the vagina.

Q: Thank you.

And, ah, were—were your medical findings consistent with the forensic interview that you conducted with [Victim]?

A: Yes.

At trial, Kirton was asked whether it would be "sick" for an adult to have sex with a child, and Kirton agreed. The State then sought to introduce a statement Kirton made at his bond hearing in which he indicated he needed mental help. The court held a *Jackson v. Denno* hearing *in camera* to determine whether to suppress the statement.

Georgetown County magistrate Benjamin Dunn testified that at Kirton's bond hearing, he read him his Miranda rights. Judge Dunn confirmed he informed Kirton of his right to remain silent and anything he said could be used against him. Judge Dunn substantiated he told Kirton he had a right to an attorney and if he could not afford an attorney that one would be appointed for him.

After informing Kirton of his rights, Judge Dunn asked Kirton, "Would you like to address the court?" Kirton responded, "I need help." Judge Dunn inquired what kind of help, and Kirton professed, "I need mental help." Judge Dunn acknowledged Kirton was in custody but asserted the purpose of the questioning was solely as it related to setting bond and not seeking anything substantive related to the charges against Kirton.

The jury found Kirton guilty of criminal sexual conduct with a minor in the second degree, and the court sentenced him to twelve years imprisonment.

## ISSUES

I. Did the trial court err in denying Kirton's motion to exclude evidence of prior bad acts?

II. Did the trial court err in denying Kirton's motion to suppress a statement made during his bond hearing?

III. Did the trial court err in admitting Dr. Rahter's testimony, which Kirton avers exceeded the parameters of time and place?

## STANDARD OF REVIEW

In criminal cases, the appellate court sits to review errors of law only. *State v. Preslar,* 364 S.C. 466, 472, 613 S.E.2d 381, 384 (Ct.App.2005) (citing *State v. Wilson,* 345 S.C. 1, 5, 545 S.E.2d 827, 829 (2001); *State v. Wood,* 362 S.C. 520, 525, 608 S.E.2d 435, 438 (Ct.App.2004)); *State v. Landis,* 362 S.C. 97, 101, 606 S.E.2d 503, 505 (Ct.App.2004); *State v. Abdullah,* 357 S.C. 344, 349, 592 S.E.2d 344, 347 (Ct.App.2004). "This court is bound by the trial court's factual findings unless they are clearly erroneous." *Preslar,* 364 S.C. at 472, 613 S.E.2d at 384; *accord State v. Baccus,* 367 S.C. 41, 48, 625

S.E.2d 216, 220 (2006) (citing *State v. Quattlebaum*, 338 S.C. 441, 442, 527 S.E.2d 105, 111 (2000)). The appellate court does not re-evaluate the facts based on its own view of the evidence but simply determines whether the trial judge's ruling is supported by any evidence. Wilson, 345 S.C. at 6, 545 S.E.2d at 829; *Preslar*, 364 S.C. at 472, 613 S.E.2d at 384; *State v. Mattison*, 352 S.C. 577, 583, 575 S.E.2d 852, 855 (Ct.App.2003).

"The admission or exclusion of evidence is left to the sound discretion of the trial judge, whose decision will not be reversed on appeal absent an abuse of discretion." *State v. Saltz*, 346 S.C. 114, 121, 551 S.E.2d 240, 244 (2001); *accord State v. Pagan*, 369 S.C. 201, 208, 631 S.E.2d 262, 265 (2006); *State v. Gaster*, 349 S.C. 545, 557, 564 S.E.2d 87, 93 (2002); *State v. McDonald*, 343 S.C. 319, 325, 540 S.E.2d 464, 467 (2000); *State v. Tucker*, 319 S.C. 425, 428, 462 S.E.2d 263, 265 (1995) (citing *State v. Bailey*, 276 S.C. 32, 37, 274 S.E.2d 913, 916 (1981)); *Wright v. Craft*, 372 S.C. 1, 33, 640 S.E.2d 486, 503 (Ct.App.2006); *State v. Funderburk*, 367 S.C. 236, 239, 625 S.E.2d 248, 249–250 (Ct.App.2006); *State v. Broaddus*, 361 S.C. 534, 539, 605 S.E.2d 579, 582 (Ct.App.2004). "A court's ruling on the admissibility of evidence will not be reversed by this Court absent an abuse of discretion or the commission of legal error which results in prejudice to the defendant." *State v. Hamilton*, 344 S.C. 344, 353, 543 S.E.2d 586, 591 (Ct.App. 2001), *overruled on other grounds by State v. Gentry*, 363 S.C. 93, 610 S.E.2d 494 (2005); *accord Preslar*, 364 S.C. at 472, 613 S.E.2d at 384; *State v. McLeod*, 362 S.C. 73, 79, 606 S.E.2d 215, 218–219 (Ct.App.2004); *State v. Mansfield*, 343 S.C. 66, 77, 538 S.E.2d 257, 263 (Ct.App.2000); *State v. Blassingame*, 338 S.C. 240, 251, 525 S.E.2d 535, 541 (Ct.App.1999); *State v. Patterson*, 337 S.C. 215, 228, 522 S.E.2d 845, 851 (Ct.App. 1999); *see State v. Jones*, 343 S.C. 562, 572, 541 S.E.2d 813, 818 (2001) ("The trial judge's decision to admit or exclude the evidence is reviewed on appeal under an abuse of discretion standard."); *State v. Taylor*, 333 S.C. 159, 172, 508 S.E.2d 870, 876 (1998) ("[I]n order for this Court to reverse a case based on the erroneous admission or exclusion of evidence, prejudice must be shown."). "An abuse of discretion arises from an error of law or a factual conclusion that is without evidentiary support." *State v. Irick*, 344 S.C. 460, 463, 545 S.E.2d 282, 284

24

(2001) (citing *Lee v. Suess,* 318 S.C. 283, 285, 457 S.E.2d 344, 346 (1995)); *accord State v. Sweet,* 374 S.C. 1, 5, 647 S.E.2d 202, 204–205 (2007); *State v. Adkins,* 353 S.C. 312, 326, 577 S.E.2d 460, 468 (Ct.App.2003).

The trial judge has considerable latitude in ruling on the admissibility of evidence and his decision should not be disturbed absent prejudicial abuse of discretion. *State v. Brazell,* 325 S.C. 65, 78, 480 S.E.2d 64, 72 (1997). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, SCRE. "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of the State of South Carolina, statutes, these rules, or by other rules promulgated by the Supreme Court of South Carolina." Rule 402, SCRE. Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Rule 403, SCRE; *State v. Aleksey,* 343 S.C. 20, 35, 538 S.E.2d 248, 256 (2000). The determination of prejudice must be based on the entire record, and the result will generally turn on the facts of each case. *State v. Brooks,* 341 S.C. 57, 62, 533 S.E.2d 325, 328 (2000). Evidence is unfairly prejudicial if it has an undue tendency to suggest decision on an improper basis, such as an emotional one. *Saltz,* 346 S.C. at 127, 551 S.E.2d at 247.

"To show prejudice, there must be a reasonable probability that the jury's verdict was influenced by the challenged evidence or the lack thereof." *White,* 372 S.C. at 374, 642 S.E.2d at 611 (citing *Fields v. Reg'l Med. Ctr. Orangeburg,* 363 S.C. 19, 26, 609 S.E.2d 506, 509 (2005)); *accord Vaught v. A.O. Hardee & Sons, Inc.,* 366 S.C. 475, 480, 623 S.E.2d 373, 375 (2005). "Error is harmless when it 'could not reasonably have affected the result of the trial.'" *State v. Mitchell,* 286 S.C. 572, 573, 336 S.E.2d 150, 151 (1985) (quoting *State v. Key,* 256 S.C. 90, 93, 180 S.E.2d 888, 890 (1971)); *accord State v. Sherard,* 303 S.C. 172, 175, 399 S.E.2d 595, 596 (1991); *Broaddus,* 361 S.C. at 542, 605 S.E.2d at 583; *State v. Adams,* 354 S.C. 361, 380, 580 S.E.2d 785, 795 (Ct.App.2003); *see also Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ("[S]ome constitutional errors which in the setting of a particular case are so unimportant and insig-

nificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction."); *State v. Rice,* 375 S.C. 302, 316, 652 S.E.2d 409, 415 (Ct.App.2007) ("The commission of legal error is harmless if it does not result in prejudice to the defendant."); *Visual Graphics Leasing Corp., Inc. v. Lucia,* 311 S.C. 484, 489, 429 S.E.2d 839, 841 (Ct.App.1993) ("An error is not reversible unless it is material and prejudicial to the substantial rights of the appellant."). "When guilt has been conclusively proven by competent evidence such that no other rational conclusion can be reached, [an appellate] court should not set aside a conviction because of errors not affecting the results." *Broaddus,* 361 S.C. at 542, 605 S.E.2d at 583 (citing *Hill v. State,* 350 S.C. 465, 472, 567 S.E.2d 847, 851 (2002)).

Factual conclusions as to the voluntariness of a statement will not be disturbed on appeal unless so manifestly erroneous as to show an abuse of discretion. *Baccus,* 367 S.C. at 48, 625 S.E.2d at 220; *State v. Von Dohlen,* 322 S.C. 234, 242, 471 S.E.2d 689, 695 (1996); *State v. Arrowood,* 375 S.C. 359, 365, 652 S.E.2d 438, 441 (Ct.App.2007). An abuse of discretion occurs when the ruling is based on an error of law or a factual conclusion that is without evidentiary support. *Arrowood,* 375 S.C. at 366, 652 S.E.2d at 442; *State v. Douglas,* 367 S.C. 498, 626 S.E.2d 59 (Ct.App.2006), *cert. granted,* June 7, 2007; *Preslar,* 364 S.C. at 472, 613 S.E.2d at 384. Accordingly, the appellate courts are "bound by fact findings in response to motions preliminary to trial when the findings are supported by the evidence and not clearly wrong or controlled by error of law." *Reed v. Becka,* 333 S.C. 676, 685, 511 S.E.2d 396, 401 (Ct.App.1999) (citing *State v. Amerson,* 311 S.C. 316, 320, 428 S.E.2d 871, 873 (1993)). When reviewing a trial judge's ruling concerning voluntariness, the appellate court does not re-evaluate the facts based on its own view of the preponderance of the evidence, but simply determines whether the trial judge's ruling is supported by any evidence. *Saltz,* 346 S.C. at 136, 551 S.E.2d at 252.

### *LAW/ANALYSIS*

### I. PRIOR BAD ACTS

Kirton maintains the trial court erred in allowing evidence into the record that he began touching and commit-

ting other sexual acts with Victim when she was six or seven years old. Kirton asseverates the prior sexual acts are not similar to the charged crime, there is not clear and convincing evidence that the prior sexual acts occurred, and the prior sexual acts are unduly prejudicial. We disagree.

South Carolina law precludes evidence of a defendant's prior crimes or other bad acts to prove the defendant's guilt for the crime charged, except to establish: (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other, or (5) the identity of the perpetrator. *State v. King,* 334 S.C. 504, 514 S.E.2d 578 (1999); *State v. Lyle,* 125 S.C. 406, 118 S.E. 803 (1923); *State v. Martucci,* 669 S.E.2d 598 (S.C.Ct.App.2008); *State v. Sweat,* 362 S.C. 117, 123, 606 S.E.2d 508, 511 (Ct.App.2004). If not the subject of a conviction, proof of prior bad acts must be clear and convincing. *State v. Weaverling,* 337 S.C. 460, 468, 523 S.E.2d 787, 791 (Ct.App.1999). When considering whether there is clear and convincing evidence, this court is bound by the trial judge's findings unless they are clearly erroneous. *State v. Tutton,* 354 S.C. 319, 325, 580 S.E.2d 186, 189 (Ct.App.2003). The record must support a logical relevance between the prior bad act and the crime for which the defendant is accused. Id. at 329, 580 S.E.2d at 192. Even though the evidence is clear and convincing and falls within a *Lyle* exception, it must be excluded if its probative value is substantially outweighed by the danger of unfair prejudice to the defendant. *Id.* at 324, 580 S.E.2d at 189. If there is any evidence to support the admission of bad act evidence, the trial judge's ruling cannot be disturbed on appeal. *State v. Wilson,* 345 S.C. 1, 6, 545 S.E.2d 827, 829 (2001).

### a. Clear and Convincing Evidence

"When considering whether there is clear and convincing evidence of other bad acts, this court is bound by the trial judge's factual findings unless they are clearly erroneous." *State v. Tutton,* 354 S.C. 319, 325, 580 S.E.2d 186, 189 (Ct.App. 2003) (citing *State v. Wilson,* 345 S.C. 1, 6, 545 S.E.2d 827, 829 (2001)). The determination of a witness's credibility is left to the trial judge who saw and heard the witness and is therefore

in a better position to evaluate his or her veracity. *Tutton,* 354 S.C. at 325–326, 580 S.E.2d at 190 (citing *State v. Rosier,* 312 S.C. 145, 149, 439 S.E.2d 307, 310 (Ct.App.1993)).

Victim testified about the events that took place beginning at approximately age seven. While she could not remember details of the events from six years prior, she specifically testified Kirton touched her breasts and crotch and made her touch his penis. She professed the abuse occurred several times a month except when Kirton first started dating his girlfriend. Testimony in the record supports the finding made by the trial judge that there was clear and convincing evidence of the prior bad acts, and that finding was not erroneous.

### b. Common Scheme or Plan

 "A close degree of similarity or connection between the prior bad act and the crime for which the defendant is on trial is required to support admissibility under the common scheme or plan exception." *State v. Cheeseboro,* 346 S.C. 526, 546, 552 S.E.2d 300, 311 (2001). Prior bad act evidence is admissible where the evidence is of such a close similarity to the charged offense that the previous act enhances the probative value of the evidence so as to outweigh the prejudicial effect. *State v. Raffaldt,* 318 S.C. 110, 114, 456 S.E.2d 390, 392 (1995). The degree of remoteness between the other crimes and the one charged is one factor to be considered in determining the connection between them. *Id.* As the similarity becomes closer, the more likely the evidence will be admissible. *State v. Aiken,* 322 S.C. 177, 180, 470 S.E.2d 404, 406 (Ct.App.1996). "The acid test of admissibility is the logical relevancy of the other crimes." *State v. Cutro,* 332 S.C. 100, 103, 504 S.E.2d 324, 325 (1998); *see also State v. Stokes,* 279 S.C. 191, 304 S.E.2d 814 (1983) (finding common scheme or plan exception requires more than mere commission of two similar crimes by the same person). When a criminal defendant's prior bad acts are directed toward the same victim and are very similar in nature, those acts are admissible as a common scheme or plan. *State v. Weaverling,* 337 S.C. at 471, 523 S.E.2d at 792–793.

We reviewed the history of jurisprudence addressing prior bad act evidence in child sexual abuse cases in *State v. Weaverling:*

In *State v. Richey,* 88 S.C. 239, 70 S.E. 729 (1911), our Supreme Court held admissible evidence that a man charged with carnal knowledge of a girl under fourteen continued his illicit relationship with the child past her fourteenth birthday. The court ruled " 'acts prior and also subsequent to the act charged in the indictment, when indicating a continuousness of illicit intercourse, are admissible in evidence as showing the relation and mutual disposition of the parties.' " *Id.* at 242, 70 S.E. at 730.

The common scheme or plan exception "is generally applied in cases involving sexual crimes, where evidence of acts prior and subsequent to the act charged in the indictment is held admissible as tending to show continued illicit intercourse between the same parties." *State v. Whitener,* 228 S.C. 244, 265, 89 S.E.2d 701, 711 (1955). Such evidence is admissible when the " 'close similarity of the charged offense and the previous act[s] enhances the probative value of the evidence so as to overrule the prejudicial effect.' " *State v. McClellan,* 283 S.C. 389, 392, 323 S.E.2d 772, 774 (1984). In *McClellan,* the Court addressed the admissibility of testimonial evidence of appellant's pattern of sexual attacks against each of his three daughters in his trial for criminal sexual conduct against the youngest daughter. The Court allowed the youngest daughter to testify the appellant had attacked her on previous occasions, even though the appellant was not charged for the previous attacks. The Court held the "prosecutrix's testimony regarding prior attacks was admissible under [the common scheme] exception to show the continued illicit intercourse forced upon her by Appellant." *Id.* at 392, 323 S.E.2d at 774.

Additionally, the Court found the testimony of the other daughters concerning prior misconduct was admissible. The experiences of each of the three daughters paralleled that of her sisters: the initial attack occurred around the time each girl reached age twelve; appellant entered their bedroom late at night and chose one of them who he would then take to his bedroom where she would be forced to

submit; he gave to each the same explanation for his actions—that he was "teaching them how to be with their husbands"; and he quoted to each a specific Bible verse during the attacks. *Id.* at 391, 323 S.E.2d at 773. The Court concluded the evidence fell squarely within the common scheme or plan exception.

Likewise, in *State v. Hallman,* 298 S.C. 172, 379 S.E.2d 115 (1989), our Supreme Court held the trial court did not err in admitting evidence of appellant's sexual abuse of three of his former foster daughters in his criminal sexual conduct trial for abuse of a fourth foster daughter. The challenged evidence included the testimony of two sisters who were foster children in the Hallman home for five years. Shortly after they were placed in his care, appellant rubbed the girls' bodies outside their clothing. He then began digital penetration and forced each girl to rub his penis. Another young woman testified that when she lived with appellant at the age of four, he forced her to rub his penis on four occasions. The charges against the appellant included, but went beyond, the type of acts testified to by the other young women. Finding the evidence of the other acts admissible, the Court explained the abuse against the victim "commenced . . . in exactly the same manner under similar circumstances" as the abuse of the other foster children. *Id.* at 175, 379 S.E.2d at 117. The Court determined "the evidence of prior bad acts bears such a close similarity to the offense charged in this case that its probative value clearly outweighs its prejudicial effect." *Id.* at 175, 379 S.E.2d at 117.

The appellant in *State v. Blanton,* 316 S.C. 31, 446 S.E.2d 438 (Ct.App.1994), claimed the trial court erred in admitting the testimony of two females in his trial for criminal sexual conduct against his granddaughter. He argued the alleged prior bad acts were not closely similar to the charged offense. In their testimony, the females indicated they had been sexually molested by appellant at approximately the same age and in the same manner as appellant's granddaughter. The Court held: "In each instance, [appellant] took advantage of his relationship with the victim for his sexual gratification. The prior acts were sufficiently similar

to the charged offense to be admissible." *Id.* at 33, 446 S.E.2d at 439.

More recently, in *State v. Adams,* 332 S.C. 139, 504 S.E.2d 124 (Ct.App.1998), the trial court's admission of appellant's stepdaughter's testimony, detailing eight years of extensive sexual abuse which mirrored the charged allegations made by another stepdaughter, was upheld under the common scheme or plan exception. The appellant used his relationship as stepfather to control both stepdaughters and engaged in similar conduct as to each. The Court announced the specifics were so similar "that proof of one tended to prove the other" and the close similarity of the other bad act evidence to the charged offense enhanced the probative value so that it outweighed the prejudicial effect. *Id.* at 143, 504 S.E.2d at 126.

*Weaverling,* 337 S.C. at 469–471, 523 S.E.2d at 791–792.

In *Weaverling,* we analyzed a situation where Weaverling was charged with performing fellatio on Doe on three occasions and providing Doe a pornographic magazine to look at on one occasion. Evidence indicated: (1) Weaverling initiated the sexual contact by pulling down Doe's pants or shorts; (2) he obtained sexual gratification by having the child review pornography; (3) beginning when Doe was seven or eight years old, almost every time they saw one another, Weaverling would get Doe alone, pull down Doe's pants, and perform oral sex on Doe; and (4) Weaverling would have Doe look at a pornographic magazine or movie during the sexual assaults. We elucidated:

The challenged testimonial evidence of Weaverling's prior bad acts shows the same illicit conduct with the same victim under similar circumstances over a period of several years. The probative value of the evidence regarding Weaverling's prior bad acts clearly outweighs the prejudicial effect of admitting the evidence. As the Court concluded in *State v. McClellan,* 283 S.C. 389, 392, 323 S.E.2d 772, 774 (1984), "[i]t would be difficult to conceive of a common scheme or plan more within the plain meaning of the exception than that presented by this evidence."

*Id.* at 471, 523 S.E.2d at 792–793.

In *State v. Tutton,* 354 S.C. 319, 580 S.E.2d 186 (Ct.App. 2003), we considered a case where Tutton was charged with

sexual assault of two sisters, twelve-year old Jane and thirteen-year old Mary. Jane alleged Tutton touched her buttocks and private parts, and she testified, "[h]e stuck his fingers inside of me." Mary advanced that Tutton touched her buttocks and private parts outside of the covers before she was able to move outside of Tutton's reach. During direct examination, the State sought to elicit testimony that Tutton had sexually assaulted Jane on another occasion several years prior to the events in question. She asserted that four or five years prior to the trial, Tutton sexually assaulted her when she and Mary were staying with Tutton because their parents were on vacation. She declared that Tutton forced her to lay down on her back and take off her panties. Tutton performed oral sex on her and forced her to perform oral sex on him. She professed Tutton threatened to tell her parents she was misbehaving if she spoke of the incident, and she didn't tell anyone about the incident prior to the investigation of Tutton's current charges.

The trial court ruled the evidence was admissible under the common scheme or plan exception to *Lyle*. We enunciated:

Sex crimes may be unique in this respect because they commonly involve the same victims engaged in repeated incidents occurring under very similar circumstances. The reason for the general admissibility of such evidence under these circumstances is self evident—where there is a pattern of continuous conduct shown, that pattern clearly supports the inference of the existence of a common scheme or plan, thus bolstering the probability that the charged act occurred in a similar fashion.

However, *Weaverling* and *McClellan* do not lower the bar for admissibility under *Lyle* simply because sexual crimes are involved. Regardless of the nature of the charges facing the defendant, there must be evidence that the defendant employed a common scheme or plan in the commission of the crimes. Where there is a pattern of continuous misconduct, as commonly found in sex crimes, that pattern supplies the necessary connection to support the existence of a plan. Presumably, this is so because the same evidence that establishes the continuous nature of the assaults will generally suffice to prove the existence of the common scheme or plan as well. In *Weaverling* and

*McClellan*, the sheer volume of repeated occurrences, together with the close similarities in the assaults, evidenced a pattern of continuous illicit conduct. Accordingly, these cases fall squarely within the plain meaning of common scheme or plan evidence. *McClellan*, 283 S.C. at 392, 323 S.E.2d at 774 (stating it would be difficult to conceive of evidence more within the common scheme or plan exception); *Weaverling*, 337 at 469, 523 S.E.2d at 791 (stating the pattern of sexual abuse represented "quintessential common scheme or plan evidence").

*Tutton*, 354 S.C. at 328–329, 580 S.E.2d at 191. We then examined the dissimilarities between the charges and the uncharged prior bad acts. We concluded:

The balancing of the similarities in cases concerning the admission of common scheme or plan evidence is a difficult task. While inferential leaps are at the heart of such decisions, we are compelled to find that the similarities in this case are insufficient to support the inference that Tutton employed a common scheme or plan to commit the assaults alleged in this case. As stated in *Lyle*, "if the court does not clearly perceive the connection between the extraneous criminal transaction and the crime charged, that is, its logical relevancy, the accused should be given the benefit of the doubt and the evidence should be rejected." *Lyle*, 125 S.C. at 417, 118 S.E. at 807; *see also State v. Henry*, 313 S.C. 106, 432 S.E.2d 489 (Ct.App.1993) (*cert. dismissed as improvidently granted*) (stating the defendant must be given the benefit of the doubt regarding the introduction of common scheme testimony where the admissibility was a close question). Because we do not clearly perceive the required connection, we hold the trial judge erred by admitting Jane's testimony about the uncharged assault under the common scheme or plan exception to *Lyle*.

*Tutton*, 354 S.C. at 333–334, 580 S.E.2d at 194 (footnote omitted).

In *State v. Hubner*, 362 S.C. 572, 608 S.E.2d 463 (Ct.App. 2005), *cert. granted*, Nov. 15, 2006, Hubner was charged with six acts of committing a lewd act upon a child. The victim met Hubner at age twelve when she became involved in a church youth group where Hubner volunteered. Hubner's actions toward her progressed for three years. The victim became

uncomfortable around him and successfully avoided him for certain periods during the three years. The victim eventually informed her youth pastor about Hubner's actions, and charges were brought.

At trial, the State proffered the testimony of Rachel, a thirty-two year old who voluntarily traveled from her home in Arizona to South Carolina. She testified that she met Hubner when her family moved to Maine in 1981, just before her twelfth birthday. Hubner lived three to four houses away and became acquainted with Rachel's parents. Rachel began to watch television with Hubner and became his friend. She would help him shovel his driveway and baby-sat his children at his house.

Rachel thought Hubner was nice to her. Hubner began to give Rachel short hugs. At some point, however, these hugs became a kind where Hubner would touch her body in the wrong way. He also began to kiss Rachel on the neck, and cheek, and would French kiss her. This contact occurred at his house while Rachel was baby-sitting. There came a time when Hubner began to fondle Rachel's breasts and bottom through her clothing and would tell Rachel she had a nice body. On one occasion, Hubner came up from behind Rachel, grabbed her chest, and "rub[bed] certain body parts." In another incident, Hubner removed Rachel's shirt, but not her bra, and just stared at her.

Hubner also would put his hands in her front and back pockets and would massage her vagina and her buttocks through her clothes. This progressed until he would also touch her vaginal area under her clothes. Hubner would also come up behind her while he had an erection and rub himself against her. On other occasions, she touched his crotch both with and without his clothes on. This behavior progressed to him masturbating in front of Rachel and having sexual intercourse with her. Hubner also gave her alcohol. Rachel testified Hubner would tell her she was pretty, she had a beautiful body, and that he loved her. He threatened to kill her if she ever told anyone.

. . .

During the hearing, Hubner took the stand and admitted pleading guilty to one count of unlawful sexual contact

against Rachel, but denied he committed any of the acts Rachel claimed he committed. After hearing the testimony and arguments, the trial judge noted that the progression of the seriousness of the acts over a period of time was different between the two cases and there were "a number of acts that were very dissimilar." Nonetheless, the judge found the similar acts were probative, and their probative value outweighed their prejudicial effect. He thus determined it was proper to admit the portions of Rachel's testimony regarding the similar acts, but the State was not allowed to go into dissimilar acts. The case proceeded to trial, and Rachel's testimony regarding the hugging, kissing and inappropriate touching was allowed into evidence over Hubner's objection. Thereafter, Hubner was found guilty on all charges and was sentenced to three consecutive twelve-year terms, two concurrent twelve-year terms, and one fifteen-year term, which was suspended with five years of probation.

*Id.*, 362 S.C. at 580–581, 608 S.E.2d at 467. We reversed, instructing:

In the case at hand, the acts were against two different victims and occurred some fourteen years apart. Thus, the testimony cannot be admitted on a generalized basis as a pattern of continuous illicit conduct under the common scheme or plan exception. Rather, the admissibility of Rachel's testimony rests solely on whether the requisite degree of similarity between the separate acts is present. As noted, this similarity must not merely be a similarity in the results. Rather, there must be such a concurrence of common features that the various acts are normally to be explained as caused by a general plan of which they are the individual manifestations.

The trial judge here recognized the numerous dissimilarities in the two cases. He nonetheless allowed into evidence prior bad acts against Rachel, attempting to limit the impact of these dissimilarities by restricting the examination of Rachel to testimony concerning only similar acts. The evidence was thus presented in a vacuum to the jury. However, this does not diminish the fact that an overwhelming number of significant dissimilarities were present between the prior bad act and the case at hand. While the

similarities may "link the two crimes," the question is whether they "paint the broader, more relevant picture" of a common scheme or plan of which they are the individual manifestations. *Tutton,* 354 S.C. at 331, 580 S.E.2d at 192–93. Thus, the trial judge failed to balance the similarities and dissimilarities in making a determination as to whether Rachel's testimony concerning the prior bad acts was admissible at all.

*Id.,* 362 S.C. at 584–585, 608 S.E.2d at 469.

In *State v. Wallace,* 364 S.C. 130, 611 S.E.2d 332 (Ct.App. 2005), *cert. granted,* Nov. 14, 2006, Wallace was convicted of second degree criminal sexual conduct with a minor. The victim accused Wallace of "push[ing] his hands up [her] privates." The trial court admitted testimony from victim's sister that on prior occasions, Wallace performed oral sex, digital penetration, and sexual intercourse on her. We reversed, determining:

In this case, the trial court did not address any connection between the two crimes to establish if the allegations by the victim's sister were admissible. The court instead ruled, "it goes to a common scheme or plan because of the close degree of similarity between the conduct, with regards to the two victims." When the State was asked to explain why the testimony was essential to its case, the solicitor responded:

This is technically a credibility case, that's what it is. It's one witness's word against potentially another witness's word. The evidence would be relevant and would be essential to the State's case because it is a piece of evidence, just like any other piece of evidence, that goes to prove or disprove the case. And this is strictly a credibility case: Therefore, this testimony is necessary to, again, prove the victim's allegations.

This argument could be used to admit testimony of any prior crime when a defendant is accused of a subsequent but similar crime. It falls far short of the threshold for the admission of a prior crime under the common scheme or plan exception to *Lyle.* Accordingly, the trial court erred in admitting the evidence on this basis.

It was also error for the trial judge to attempt to limit the testimony of the sister so that there would be a close similarity between the prior bad act and the crime charged. The court noted that the testimony of the sister was more egregious than that of the victim and ordered the testimony redacted, stating, "I find it appropriate under *State v. Tutton* to limit the testimony of the Lyle witness only to the extent and only to the acts which occurred to the victim in this prosecution, and not to go beyond that, which will limit the prejudicial effect of this testimony coming in." This court in *Tutton* concluded the differences in the evidence proffered of the prior criminal sexual conduct was sufficiently different to render it inadmissible. *Tutton*, 354 S.C. at 333, 580 S.E.2d at 194. We did not, however, sanction the redaction of testimony in order to make similar that which is dissimilar.

*Wallace*, 364 S.C. at 141, 611 S.E.2d at 338.

The case at bar is formed out of the same mold as *Weaverling* and *McClellan*. All of Kirton's alleged activity was directed toward the same victim. The six to seven year pattern of escalating abuse of Victim by Kirton is the essence of grooming and continuous illicit activity. Kirton began by rubbing the minor victim's breasts, proceeded to make her touch his penis, began touching her vagina as she got older, and finally culminated the sexual abuse by engaging in the intercourse for which he was charged. The prior sexual acts did not take place just once or twice, six or seven years ago. Victim indicated they happened several times a month for years. While the prior sexual acts are not the same as the exact crime for which Kirton was charged, Victim detailed a clear pattern of escalating sexual abuse and not a few isolated, unrelated incidents.

Kirton's prior abuse of the minor victim was clearly "part of an overall plan or scheme devised by him to perpetuate the type of misconduct that occurred." *Tutton*, 354 S.C. at 330, 580 S.E.2d at 192. The probative value of the evidence was so great that it substantially outweighed the danger of unfair prejudice, confusion of the issues, or misleading the jury. The trial court properly found the evidence was admissible to show a common scheme or plan, and Kirton's continuous illicit

conduct toward Victim was extremely probative to prove the charged criminal sexual conduct occurred.

### c. Harmless Error

 Whether an error is harmless depends on the circumstances of the particular case. *In re Harvey,* 355 S.C. 53, 63, 584 S.E.2d 893, 897 (2003); *Taylor,* 333 S.C. at 172, 508 S.E.2d at 876; *State v. Thompson,* 352 S.C. 552, 562, 575 S.E.2d 77, 83 (Ct.App.2003). "No definite rule of law governs this finding; rather, the materiality and prejudicial character of the error must be determined from its relationship to the entire case." *Mitchell,* 286 S.C. at 573, 336 S.E.2d at 151.

 Error is harmless where it could not reasonably have affected the result of the trial. *In re Harvey,* 355 S.C. at 63, 584 S.E.2d at 897; *Mitchell,* 286 S.C. at 573, 336 S.E.2d at 151; *State v. Burton,* 326 S.C. 605, 610, 486 S.E.2d 762, 764 (Ct.App.1997). Generally, appellate courts will not set aside convictions due to insubstantial errors not affecting the result. *State v. Sherard,* 303 S.C. 172, 176, 399 S.E.2d 595, 597 (1991); *State v. Adams,* 354 S.C. 361, 380–381, 580 S.E.2d 785, 795 (2003). Thus, an insubstantial error not affecting the result of the trial is harmless when guilt has been conclusively proven by competent evidence such that no other rational conclusion can be reached. *State v. Bailey,* 298 S.C. 1, 5, 377 S.E.2d 581, 584 (1989). The admission of improper evidence is harmless where the evidence is merely cumulative to other evidence. *State v. Blackburn,* 271 S.C. 324, 329, 247 S.E.2d 334, 337 (1978); *State v. Weaverling,* 337 S.C. 460, 471, 523 S.E.2d 787, 793 (Ct.App.1999); *see also State v. Williams,* 321 S.C. 455, 463, 469 S.E.2d 49, 54 (1996) (instructing that error in admission of evidence is harmless where it is cumulative to other evidence which is properly admitted).

At trial, Victim, Dr. Rahter, and Victim's friend all testified regarding Kirton's touching Victim prior to the forcible intercourse for which he was charged. While the objection to the testimony presented by Victim was preserved, Kirton did not timely object to the testimony by the Victim's friend or Dr. Rahter. Accordingly, the admission of Victim's testimony would have been harmless error because it was merely cumulative to her friend's testimony and Dr. Rahter's testimony

38

that was entered into evidence without a contemporaneous objection. *See State v. Haselden,* 353 S.C. 190, 577 S.E.2d 445 (2003) (recognizing admission of improper evidence is harmless where the evidence is merely cumulative to other evidence); *State v. Schumpert,* 312 S.C. 502, 435 S.E.2d 859 (1993) (finding any error in admission of evidence cumulative to other unobjected-to evidence is harmless); *State v. Johnson,* 298 S.C. 496, 498, 381 S.E.2d 732, 733 (1989) (instructing admission of improper evidence is harmless where it is merely cumulative to other evidence); *Broaddus,* 361 S.C. at 542, 605 S.E.2d at 583–84 (concluding error in admission of drug evidence was harmless where it was cumulative to other unobjected-to testimony at trial regarding drug use and drug dealing); *State v. Richardson,* 358 S.C. 586, 596–97, 595 S.E.2d 858, 863 (Ct.App.2004) (observing even if the challenged testimony constituted improper "character evidence," any error in its admission was harmless where the testimony was cumulative to other similar testimony that was admitted without objection); *see also State v. Brown,* 344 S.C. 70, 75, 543 S.E.2d 552, 555 (Ct.App.2001) (holding any error in admitting evidence of murder defendant's violent character was harmless as properly admitted evidence of the defendant's use of force during his argument with victim the previous day clearly demonstrated defendant's propensity to become violent).

Assuming, *arguendo,* that the trial judge did err in admitting Victim's testimony, such error was harmless.

## II. BOND HEARING STATEMENT

Kirton posits the trial court erred in denying his motion to suppress a statement made during his bond hearing. We disagree

■ The trial court's determination of whether a defendant was deprived of his *Miranda* rights will be upheld unless unsupported by the record. *See State v. Navy,* 370 S.C. 398, 405, 635 S.E.2d 549, 553 (Ct.App.2006) ("Appellate review of whether person is in custody for Miranda purposes is limited to a determination of whether the trial judge's ruling is supported by the record.")

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court held the Fifth Amendment privilege against self-incrimination prohibits admitting statements, whether exculpatory or inculpatory, given by a suspect during "custodial interrogation" without following prescribed procedural safeguards. *Id.* at 444, 86 S.Ct. 1602. Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody." *Id.* "The warning mandated by Miranda was meant to preserve the privilege during 'incommunicado interrogation of individuals in a police-dominated atmosphere.'" *Illinois v. Perkins*, 496 U.S. 292, 296, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990) (quoting *Miranda*, 384 U.S. at 445, 86 S.Ct. 1602).

### a. Custodial Interrogation

In the case *sub judice*, Kirton was not subjected to custodial interrogation at his bond hearing, even though he was in custody at the time. There is no evidence that he was subjected to questioning by law enforcement or any other interrogation such that the requirement to provide *Miranda* warnings attached.

"Interrogation is either express questioning or its functional equivalent. It includes words or actions on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *State v. Kennedy*, 325 S.C. 295, 303, 479 S.E.2d 838, 842 (Ct.App.1996), *aff'd as modified*, 333 S.C. 426, 510 S.E.2d 714 (1998) (citing *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *State v. Franklin*, 299 S.C. 133, 382 S.E.2d 911 (1989)).

> The *Miranda* decision is meant to preserve the privilege against self-incrimination during interrogation of a suspect in a police dominated atmosphere. The police dominated atmosphere generates "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."

*State v. Lynch*, 375 S.C. 628, 635, 654 S.E.2d 292, 296 (Ct.App. 2007) (quoting *Illinois v. Perkins*, 496 U.S. at 296, 110 S.Ct. 2394).

Not all encounters with law enforcement require *Miranda* warnings to be given. Requiring a suspect to perform field sobriety tests during a traffic stop does not constitute detainment sufficient to rise to the level of "custodial interrogation." *State v. Peele*, 298 S.C. 63, 66, 378 S.E.2d 254, 256 (1989).

In discussing the difference between Sixth Amendment right to counsel and the Fifth Amendment right as memorialized in *Miranda*, the United States Supreme Court has held a suspect's *Miranda* rights are only invoked by "some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police. Requesting the assistance of an attorney at a bail hearing does not bear that construction." *McNeil v. Wisconsin*, 501 U.S. 171, 179, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) (emphasis removed). The Court in *McNeil* found a bail hearing is not a setting in which custodial interrogation takes place requiring *Miranda* warnings. The Illinois Supreme Court recognized:

> It is not surprising that virtually every Supreme Court opinion involving *Miranda* has used the phrase "custodial interrogation." It is custodial interrogation with which *Miranda* was concerned.... While in court on a bond hearing, a defendant is not subject to interrogation, and the need for *Miranda* is not yet present.... Absent the interplay of custody and interrogation, an individual's privilege against self-incrimination is not threatened.

*People v. Villalobos*, 193 Ill.2d 229, 250 Ill.Dec. 17, 737 N.E.2d 639, 645 (2000).

The Maryland Court of Appeals dealt with a remarkably similar case in *Fenner v. State*, 381 Md. 1, 846 A.2d 1020 (2004). At Fenner's bail hearing, he was asked, "Is there anything you'd like to tell me about yourself, sir?" *Id.* at 1023. During the colloquy that followed, statements were made which the State sought to admit at his trial. Fenner sought to suppress the statements because he was not given his *Miranda* warnings. The court held that *Miranda* warnings were not required because Fenner was not subject to custodial interrogation. Specifically, the court reasoned "any questions asked of an arrestee at a bail hearing should normally be general and unrelated to evidence gathering or prosecution." *Id.* at 1028. The court announced:

We hold that nothing in the setting of petitioner's January 10, 2001 bail review hearing can be said to have coerced him into making his inculpatory statement. The question posed, "Is there anything you'd like to tell me about yourself, sir?," was a routine question to ask in a setting such as a bail review hearing. Questions posed to an arrestee by a judge regarding matters relevant to bail, asked in the setting of a bail review hearing, do not normally amount to an "interrogation" requiring that the arrestee be again advised of his *Miranda* rights in order that his responses may be later admitted into evidence at his merits trial.

*Id.* at 1030 (footnote omitted).

Kirton was not questioned by law enforcement or anyone associated with law enforcement. He was asked a single question by a magistrate presiding over his bond hearing. The innocuous question related solely to the setting of the bond and in no way was intended to elicit an incriminating response. There was no requirement that Kirton be advised of his *Miranda* rights and no requirement that a waiver of those rights be obtained. The trial court did not err in admitting into evidence Kirton's voluntary statement made at his bond hearing.

### b. Miranda Warnings and Voluntary Waiver

Kirton contends he was not properly advised of his Miranda rights and, even if he was advised, the State failed to demonstrate he voluntarily waived his rights. We disagree.

"The well-known Miranda rights are that the accused must be informed of: the right to remain silent; any statement made may be used as evidence against him or her; and the right to the presence of an attorney." *State v. Lynch*, 375 S.C. 628, 633 n. 5, 654 S.E.2d 292, 295 n. 5 (Ct.App.2007) (citing *State v. Kennedy*, 325 S.C. 295, 303, 479 S.E.2d 838, 842 (Ct.App.1996), *aff'd as modified*, 333 S.C. 426, 510 S.E.2d 714 (1998)).

During the *in camera* hearing, Judge Dunn testified, "When he came in, I advised him that this was his bond hearing; not his trial. And I read him his rights." Judge Dunn elaborated about the rights he explained to Kirton: "advised him that he has the right to remain silent; and anything that he says can be held against him [in] a court of law.... And I asked him—

42

I said: Do you understand that?" According to Judge Dunn, Kirton answered that he did. The trial court asked Judge Dunn, "Do you as a common course ... advise defendants of their right to have an attorney; and that if they cannot afford an attorney ... to contact the Public Defender's Office?" Judge Dunn responded, "Yes sir."

The State introduced the Magistrate's Bond Hearing Checklist, which indicated a check mark beside "Defendant was advised of his right to counsel—to an appointed counsel if financial unable." It was only after advising Kirton of his rights and going through the checklist that Judge Dunn asked Kirton if there was anything he wanted to say to the court. At the *in camera* hearing, Kirton testified that Judge Dunn went down the checklist and "[h]e read me rights ... and then set my bond." The evidence in the record amply supports a finding that Kirton was properly advised of his *Miranda* rights and given the opportunity to waive them.

There is no indication Kirton was under the influence of drugs or alcohol. There is no evidence Kirton was coerced into making a statement, was promised anything in exchange for his statement, or made his statement by anything other than his own volition. Judge Dunn's testimony supports the conclusion that Kirton voluntarily waived his rights and freely made his statement to the magistrate. The trial court's admission of Kirton's statement did not constitute error.

## III. TIME AND PLACE EVIDENCE

Kirton avers the trial court erred in allowing testimony by the State's expert witness, Dr. Carol Rahter, that went beyond the corroborative testimony allowed by Rule 801(d)(1)(D), SCRE. Rule 801(d)(1)(D) states, "A statement is not hearsay if ... [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (D) consistent with the declarant's testimony in a criminal sexual conduct case or attempted criminal sexual conduct case where the declarant is the alleged victim and the statement is limited to the time and place of the incident."

### a. Preservation

The issue Kirton raises is not properly preserved for review on appeal. Kirton relies on a motion made prior to

trial to allege the issues are properly preserved for review on appeal. Prior to trial, Kirton's counsel stated, "I have one motion that the Court caution the State that any corroboration of [Victim's] allegation of sexual abuse be strictly limited to time and place, and I would impose that on each of the testifying witnesses and also to Dr. Rahter as she testified also." The court did not consider the motion to be a motion *in limine*, but as a motion "to simply be sure that the witnesses do not come in and without an understanding." The court explained:

> I would expect that if questions come up which defense counsel feels are proper questions and you feel are improper questions, you will interpose an appropriate objection, and likewise, if questions are asked that you feel are proper and defense counsel feels are improper, ... he will impose proper objections.

The ruling by the court prior to trial was not a final ruling and the court expected counsel to offer a contemporaneous objection if allegedly improper testimony is offered. Significant testimony occurred between the pre-trial motion and Dr. Rahter's testimony that is challenged. The pre-trial motion, therefore, did not act to preserve the issue for review on appeal. *See State v. Forrester*, 343 S.C. 637, 642–43, 541 S.E.2d 837, 840 (2001) (finding only when no evidence is taken between the trial court's *in limine* ruling and the admission at trial of the evidence is the issue preserved without a contemporaneous objection).

Kirton alleges the objections were entered into the record by counsel. Kirton points to two instances where Dr. Rahter's testimony included allegedly improper hearsay testimony beyond that which is allowed by Rule 801(d)(1)(D). The first instance is when Dr. Rahter was testifying regarding the beginning of the sexual abuse Victim suffered. Dr. Rahter stated she was told by Victim that the first time the abuse occurred was when Victim was seven and the last time was about four weekends before their interview. No contemporaneous objection was made when Dr. Rahter testified about the abuse. *See State v. Johnson*, 363 S.C. 53, 58–59, 609 S.E.2d 520, 523 (2005) ("To preserve an issue for review there must be a contemporaneous objection that is ruled upon by the trial court.... If a party fails to properly object, the party is procedurally barred from raising the issue on appeal.").

When Dr. Rahter testified regarding whether the medical findings-that Victim's hymen had been transected by a "penetrating injury"—and Victim's testimony were consistent, Kirton failed to object on any grounds. Kirton directs this Court to an exchange with the trial court after Dr. Rahter's testimony and counsel's objection after the presentation of Kirton's case before he rested. Neither of these objections was contemporaneous to Dr. Rahter's testimony. Kirton's counsel even admitted to the trial court: "I know I did not contemporaneously object when she answered that but the Court prior to that made its ruling, and I'm going to see if I can preserve it by putting the sidebar on."

### b. Cumulative

Even if properly preserved, the allegedly improper testimony is cumulative to other un-objected to testimony. Several other witnesses testified regarding Victim's statements about abuse by Kirton. The other witnesses' testimony identifies Kirton as the perpetrator and provides some details of the abuse. See *State v. Schumpert*, 312 S.C. 502, 507, 435 S.E.2d 859, 862 (1993) (stating that any error in admission of evidence cumulative to other unobjected-to evidence is harmless); *State v. Johnson*, 298 S.C. 496, 499, 381 S.E.2d 732, 733 (1989) ("The admission of improper evidence is harmless where it is merely cumulative to other evidence.").

### c. Not Improper Testimony

The testimony by Dr. Rahter was not improper hearsay testimony. The first instance alleged in Kirton's brief included only the date or time frame of the alleged abuse. This testimony is properly allowed under Rule 801(d)(1)(D), SCRE.

The second instance involved testimony regarding the medical findings by Dr. Rahter. This testimony was properly admitted as evidence used by the expert witness in forming her opinion that the medical findings were consistent with the interview conducted with Victim. Dr. Rahter explained why the statements and medical findings were significant. The testimony was admitted as forming the base of her opinion and not for the truth of the matter asserted. *See, e.g., Howle v. PYA/Monarch, Inc.*, 288 S.C. 586, 595–596, 344 S.E.2d 157, 162 (Ct.App.1986).

The issue raised in Kirton's brief is not properly preserved for review on appeal, the testimony was cumulative to other unobjected-to testimony, and the testimony was not improper hearsay. The trial court did not err in admitting the testimony.

## CONCLUSION

We hold the trial court properly denied Kirton's motion to exclude evidence of prior bad acts. Notwithstanding that Kirton's appearance before a magistrate at his bond hearing did not require *Miranda* warnings, Kirton was given the *Miranda* warnings and voluntarily waived his rights by stating he needed "mental help." The trial court's admission of this statement was not in error. Despite Kirton's failure to preserve any objection to Dr. Rahter's testimony, her testimony was proper and cumulative to other unobjected-to evidence. Therefore, the trial court did not err in admitting her testimony.

Accordingly, Kirton's conviction is

**AFFIRMED.**

HUFF and THOMAS, JJ., concur.