683 S.E.2d 500

**The STATE, Respondent,**

v.

**Kevin Dwayne GOODWIN, Appellant.**

**No. 4571.**

Court of Appeals of South Carolina.

Heard April 21, 2009.

Decided June 23, 2009.

Appellate Defender Elizabeth A. Franklin, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka; and Solicitor Warren B. Giese, all of Columbia, for Respondent.

SHORT, J.

Kevin Dwayne Goodwin appeals his convictions and sentences for first-degree burglary and murder. Goodwin argues the trial court erred in admitting his statements into evidence and denying his mistrial motion. We affirm.

## FACTS

On June 7, 2004, Dr. Joseph Dillard's residence was burglarized. Sometime during the burglary, Dillard returned home, surprised the intruder, and was fatally shot. During a search of Dillard's home, a cigar butt containing DNA evidence was found near the point of entry, which was a broken window in the back of the house.

Five days later, Officer Derwood Joseph Barton, Jr. was contacted by a DNA analyst who informed him the DNA found on the cigar butt matched Goodwin's DNA.[1] As a result, Barton visited three locations he suspected Goodwin frequented to obtain physical descriptions for potential search warrants. At the same time, Officer Bryant William Hinson, Jr. was in transit to get the magistrate to sign an arrest warrant alleging Goodwin was responsible for burglarizing Dillard's home.

When Barton arrived at one of the three locations he suspected Goodwin frequented, he observed Goodwin outside. Barton asked him for assistance in an attempt to dispel suspicion, but Goodwin shook his head and walked back inside the house. Barton then moved his vehicle to the entrance of

1. Goodwin's DNA was in the police database C.O.D.I.S.

the dead-end road where he could maintain visual surveillance, and called for backup. Hinson heard Barton's request for backup and responded before he obtained the magistrate's signature on the arrest warrant.

After additional officers arrived, Goodwin attempted to leave the house in a car with his grandmother. The officers stopped his vehicle and arrested Goodwin for the burglary charge. After the arrest, officers arrived with a search warrant and searched the residence.

Goodwin was transported to the police station where he was interrogated by Hinson and Barton. The interrogation was audio-taped. Hinson advised Goodwin of his right to remain silent and his right to an attorney. When asked if he understood his rights, Goodwin replied in the affirmative. Hinson asked Goodwin if he was willing to speak with them, and Goodwin replied: "I'll listen, yeah I'll listen." Then Hinson asked Goodwin if he would be willing to sign the waiver of rights form, and the following colloquy took place:

Hinson: Okay. Are you willing to sign this?

Goodwin: So what is it say....

Hinson: All it is....

Goodwin: ... sign over my rights?

Hinson: All it is, is your basically saying that we told you these, you understand them and you're willing to talk to us. As you read, you don't have to say a thing if you don't want to.

Barton: Right. You're not signing any rights away, I'll [sic] you gotta do, if you don't want to talk to us, don't talk to us. If, if you want to stop, you can stop.

Goodwin: Yeah, I'll sign. Yeah, I'll listen.

As a result, Goodwin signed the waiver.

Once the interrogation began, Hinson informed Goodwin they had DNA and fingerprint evidence linking him to the burglary. However, at that point in their investigation, the palm print found at Dillard's house had not yet been matched to Goodwin. Additionally, Hinson informed Goodwin that Dillard's neighbors saw him at the time of the burglary. However, during his cross-examination at trial, Hinson testified the neighbor indicated they saw someone at Dillard's

before the police arrived, but did not identify Goodwin as the perpetrator. Moreover, Hinson pressed Goodwin about the guns stolen from Dillard's house:

And we'd like to get the guns. I mean, we've already been in a couple of houses, we're fixing to go to a couple of more houses. I mean I don't want to waste our time anymore than we have to, going all over these places harassing people, going in people's houses that had absolutely nothing to do with this and putting them in, ya know, putting them out and staying there hours on end cause these are your loved ones that we going to these houses, or your friends, that we going to these houses. I mean, I don't want to do that. I'm sure you don't want us to have to do that or you don't want it for them anyway.

Eventually, Goodwin admitted to breaking into the house, but denied killing Dillard. Barton asked: "Alright, you didn't kill nobody, but, who took you to the house?" Goodwin responded: "I'm saying I can have some time to think on this here? I can think on this?" Hinson replied: "Well, you think on that and we'll think of something else to ask you. How about that. You think, you think about that." The officers began to question Goodwin about the stolen guns.

Shortly thereafter, the officers began questioning Goodwin about the stolen jewelry. Additionally, Barton began discussing what Goodwin could be charged with: "You, you understand, you understand, you, you're in the house, were in the house, you admitting to being in the house, you admitting to taking the gun. If you take one gun or if you take the whole house, it's still burglary [first]." The officers then began to tell Goodwin it would be in his best interest to tell them what happened, and Barton stated: "[T]he longer you wait, the more chance that somebody else is going to tell your story or tell their side of a story that doesn't sound good for you and you won't get to tell your story because we won't need to talk to you."

As a result, Goodwin began talking about how he would receive a life sentence regardless of whether he identified the murderer because of the burglary charge and his previous conviction. Then, Barton pointed out that South Carolina also

employed the death penalty. Goodwin replied that the death penalty would be better than a life sentence.

Next, the officers began to push Goodwin to talk by discussing Goodwin's family and their reactions to the burglary and murder:

Barton: Do you know how bad tore up your daddy is right now?

Goodwin: Huh, yeah.

Barton: And your momma.

Goodwin: um, yeah.

Barton: I mean they good people ...

Hinson: And your girlfriend too

Goodwin: Yeah, I know.

Barton: But you want your kids, your 6 and 11 year old child to think that you're a cold blooded murderer, that you would just put somebody down and shoot them in the back of the head. Not that you had, you know, that's, but if you don't tell your side, you don't tell that somebody else was there or whatever, they'll never know.

Goodwin began telling the officers that he entered the house to rob it after he noticed it was already burglarized. He admitted to stealing a gun, some jewelry, and urinating in the bathroom. Hinson then instructed Goodwin they were matching footprints found at the scene to shoes taken from the search of his residence. Moreover, Hinson explained some of the items recovered from Goodwin's residence were items stolen in another burglary incident on Lake Shore Drive.

Additionally, the officers told Goodwin that the jury would consider his cooperation because at trial, the prosecutor would ask them if he was cooperative. Barton attempted to push Goodwin to confess to murder, stating: "using your logic and your reality, okay, that life sentence, you going to get it anyway, right?" Barton also tried to get Goodwin to confess by saying the shooting was an accident: "And your momma and daddy don't have to deal with the fact they raised somebody that killed somebody in cold blood, shot him in the back of the head." Barton stated:

[Y]ou're telling me, that your [sic] cooked anyway, that your [sic] going to get life one way or the other. It's time you

start thinking about the other people in your life. And I, I'm using your logic, I'm not putting this on you. I'm not saying that's what I think. I'm just saying using your own, using your own words, if you're done anyways, you need to start thinking about the people in your life. [Because] your daddy said that today, he said Lord, I can't even leave out my house. You got two boys. What they going to think? Daddy's a murderer or daddy did some bad things in life and some shit happened bad and he had to do what he had to do. It was him or, or me. There's a big difference.

At this point in the interrogation, Goodwin began to ask the officers about a plea bargain. Hinson instructed Goodwin only the solicitor's office could offer a plea bargain, but stated:

I mean, but there's no plea bargain I can see. I mean there's, there's really no room except for maybe life to, [I] mean from a death penalty to life without a chance of parole ... but I can't say. We don't have the authority to make that but I, but I can assure you it won't go any lower than that. There's no way.

. . . .

You, in fact you really think they going to plea bargain on something like that [ (murder) ]. I mean, I ain't even going to sit here and try to tell you something that you, you know. That ain't going to happen. I mean, but when it comes down to was he cooperative, was he not, it can make a difference on where you're going. What happens with you when you get to SCDC. Those types of things can, can always be worked out.

Finally, Goodwin admitted to shooting Dillard, and claimed Dillard startled him while he was robbing the house. Goodwin also stated he flushed all the jewelry he stole down the toilet, and got rid of the guns. The officers then asked Goodwin to handwrite a statement, and Goodwin declined. However, Goodwin did agree to sign a typed statement, and also admitted to taking a television and cigar box from the other burglarized house on Lake Shore Drive.

As a result, the officers took Goodwin across the hall into their offices and typed a statement. According to Barton and Hinson, the three discussed the burglary and murder in more detail, typed and printed the statement, and Goodwin read

over the statement and signed it. Additionally, Goodwin admitted the boots found during the search of his residence were the boots he wore during the burglary. Goodwin asked the officers if he could make a phone call and called his girlfriend. The officers overheard him say, "It's all over. They know everything."

The next day, Officers Hinson and Barton visited Goodwin at the jail to discuss the location of the missing guns because they were having trouble finding them. Goodwin was not re-advised of his rights. The officers returned the next day and took Goodwin out of jail to point out the exact location where he disposed of the guns.

During pretrial motions, Goodwin argued the officers lacked probable cause to arrest him because the only evidence they had was the DNA match on the cigar butt, which did not amount to probable cause for an arrest. The State maintained the cigar butt placed Goodwin within inches of the point of entry where a house was burgled and a man was fatally shot; thus, there was probable cause because the officers believed Goodwin was guilty of a felony. Goodwin contended the cigar butt did not place him inside the house, and the palm print was not matched to his until much later. The trial court found probable cause existed for Goodwin's arrest based on the cigar butt containing his DNA found so close to the point of entry.

Next, a *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), hearing was held to determine the admissibility of Goodwin's statements. Hinson testified he informed Goodwin of his constitutional rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), using the form on his computer. Hinson stated he believed Goodwin was not under the influence of alcohol or drugs, seemed coherent, seemed to understand what he was saying to the officers, and seemed to understand the circumstances of the interrogation. Hinson maintained the interrogation lasted seventy minutes. Additionally, Hinson contended Goodwin never invoked his right to remain silent or asked to speak to an attorney.

Barton testified Goodwin was coherent, understood what was going on, responded appropriately, was advised of his rights, and signed the *Miranda* waiver. Barton also stated

Goodwin never asked for an attorney or to stop the questioning, and he and Hinson did not threaten or coerce Goodwin, or promise him anything in return for his statement.

The State argued it proved the voluntariness of the statement through the officers' testimony which was corroborated by the audio tape where Goodwin was advised of his rights, stated he understood his rights, and signed the waiver. The State defended the officers' discussion of the death penalty and asserted the officers' statements were that they did not have authority to make any kind of plea deal with Goodwin. Additionally, the State maintained the officers' encouraging Goodwin to tell the truth was not equivalent to promising Goodwin something in exchange for a confession. Moreover, the State contended there was a continuation between the six statements, and Goodwin never asked to end the two questionings at the police station and the follow-up questionings at the jail.

Goodwin conceded he never requested an attorney. However, he maintained his statement, "let me think about this," invoked his right to remain silent. Additionally, Goodwin argued his will was overborne because the officers were lying to him about the evidence, bringing up his family's perception, and discussing the death penalty. Moreover, Goodwin pointed out he was never re-advised of his constitutional rights after the first audio-taped interrogation.

In reply, the State argued the officers were trying to find out the truth, were not overbearing, and, while Goodwin said he would listen and did not expressly state he would converse, he signed the *Miranda* waiver indicating he was willing to talk. The trial court found by the preponderance of the evidence the initial waiver was voluntarily and knowingly made, there was no coercion and no promises made, and there was no evidence Goodwin's will was overborne. Accordingly, the trial court admitted all six statements,[2] finding they were

---

2. The six statements were:
    1. Audio taped interrogation at the police station.
    2. Written statement at the police station.
    3. Statement admitting the boots recovered at his residence were the ones he wore during the burglary and murder.
    4. Overheard statement to his girlfriend on the phone: "It's all over. They know everything."

all a continuation and Goodwin never invoked his right to remain silent.

During the State's closing argument, the solicitor stated:

Do you remember I asked Special Agent Barton on the stand, this is about the audiotape and about the interview, subsequent interviews: Question, "Through all your extensive training in the area, is there anything that you did, or anybody did, in interrogation of the defendant in this case that's not accepted interview procedure.?" ... Special Agent Barton, "Nothing, Nothing." ... Uncontradicted testimony.

Goodwin objected, arguing the State impermissibly shifted the burden of proof. The trial court overruled the objection. After the State finished its closing argument, Goodwin moved for a mistrial based on the burden shifting objection. The trial court responded: "I don't believe that the comment made during the closing rises to the level of burden shifting. The motion was denied, but your position is stated on the record."

Before the court charged the jury, Goodwin took exception to the charge that the waiver of the right to remain silent is a permanent one. The trial court acknowledged Goodwin's objection, stating it would allow him to take exception once the charge was given. Accordingly, the trial court charged the jury extensively on the voluntariness of statements, how much weight to afford statements during deliberation, and the State's burden to prove beyond a reasonable doubt that the statement was given freely and voluntarily. The jury convicted Goodwin as charged, and he was sentenced to life imprisonment without the possibility of parole. This appeal followed.

## STANDARD OF REVIEW

■■ "In criminal cases, the appellate court sits to review errors of law only." *State v. Baccus,* 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006). Thus, an appellate court is bound by the trial court's factual findings unless they are clearly erroneous. *Id.*

---

5. Written statement taken the day after his arrest while he was in jail.
6. Statement taken two days after his arrest when he was taken out of jail by the officers to identify the location of the guns.

## LAW/ANALYSIS

### I. Admissibility of Goodwin's Statements

Goodwin argues the trial court abused its discretion in admitting his statements into evidence, asserting various arguments. We address each argument individually.

"The admission of evidence is within the discretion of the trial court and will not be reversed absent an abuse of discretion. An abuse of discretion occurs when the conclusions of the trial court either lack evidentiary support or are controlled by an error of law." *State v. Pagan*, 369 S.C. 201, 208, 631 S.E.2d 262, 265 (2006). "When reviewing a trial judge's ruling concerning voluntariness, the appellate court does not re-evaluate the facts based on its own view of the preponderance of the evidence, but simply determines whether the trial judge's ruling is supported by any evidence." *State v. Miller*, 375 S.C. 370, 378–79, 652 S.E.2d 444, 448 (Ct.App.2007).

When seeking to introduce a confession, the State must prove that the statement was voluntary and taken in compliance with *Miranda*. *State v. Middleton*, 288 S.C. 21, 25, 339 S.E.2d 692, 694 (1986).

The test of voluntariness is whether a defendant's will was overborne by the circumstances surrounding the giving of a confession. *Dickerson v. U.S.*, 530 U.S. 428, 434, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). When considering the voluntariness of a statement, the court and jury should consider "not only the crucial element of police coercion; the length of the interrogation; its location; its continuity; the defendant's maturity; education; physical condition; and mental health." *Withrow v. Williams*, 507 U.S. 680, 693, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993) (omitting internal citations). Misrepresentations of evidence by police, although a relevant factor, do not render an otherwise voluntary confession inadmissible. *Frazier v. Cupp*, 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969). "Coercion is determined from the perspective of the suspect." *Miller*, 375 S.C. at 386, 652 S.E.2d at 452.

The question of whether law enforcement complied with the requirements of *Miranda* is for the court, not the jury. *State v. Davis*, 309 S.C. 326, 342, 422 S.E.2d 133, 143 (1992), *overruled on other grounds by Brightman v. State*, 336 S.C. 348, 520 S.E.2d 614 (1999). "Once the court determines that a defendant received and understood his rights, the court allows a confession into evidence." *Davis*, 309 S.C. at 342, 422 S.E.2d at 143. "It then is for the jury ultimately to decide whether the confession was voluntary." *Id.*

Although the court must make the initial determination of admissibility, the trial court must instruct the jury that it cannot consider any confession unless it finds beyond a reasonable doubt that the accused gave his statement freely and voluntarily under the totality of the circumstances. *Davis*, 309 S.C. at 342–43, 422 S.E.2d at 143. An express waiver is unnecessary to support a finding that the defendant has waived his or her *Miranda* rights. *State v. Kennedy*, 333 S.C. 426, 429, 510 S.E.2d 714, 715 (1998). Once a voluntary waiver is made, it continues until the individual being questioned indicates he wants to revoke the waiver and remain silent or circumstances exist which establish that his will has been overborne and his capacity for self-determination critically impaired. *State v. Rochester*, 301 S.C. 196, 200, 391 S.E.2d 244, 246 (1990).

### a. Overborne Will

Goodwin maintains the trial court abused its discretion by admitting his statements into evidence when the officers created an environment that caused his will to be overborne. We disagree.

Here, Goodwin maintains his will was overborne by the culmination of police tactics used during his interrogation. Specifically, he cites the officers' lying about evidence, threatening inappropriate and unjustifiable police action against his family members, strongly suggesting they could influence the State's decision to seek the death penalty, and numerous emotional appeals relating to his family.

When considering the *Withrow* factors to determine the voluntariness of Goodwin's statement, we find the trial court properly admitted Goodwin's statements. Goodwin evidenced

his knowledge of the judicial system in the audio taped interview when he initiated a conversation about his probable sentence. The initial interrogation lasted seventy minutes, and Goodwin was offered food, drink, and the opportunity to use the facilities. Moreover, the first four statements were at the police station, in an interview room and in the officers' offices. The fifth interview was at the jail, and the sixth was during an excursion from jail. Furthermore, the questioning was at the most a continuous seventy minutes, and while there were six individual statements, all occurred within a three-day period. At no time during the three days did Goodwin state he wished to stop the questioning, and he never requested an attorney. Finally, no evidence exists to suggest Goodwin was suffering from a mental or physical condition.

While we do not condone the officers' statements regarding their evidence and Goodwin's family, we do not find they overbore Goodwin's will. The argument that the officers' had influence over the State's decision to seek the death penalty is factually without merit for two reasons: Goodwin initiated the discussion about sentencing and the death penalty, and the officers repeatedly stated that they had no influence over plea negotiations. Accordingly, we find the officers did not create an environment that caused Goodwin's will be to overborne, and when viewing the totality of the circumstances surrounding Goodwin's statements, evidence exists to support the trial court's determination that the statements were voluntary.

### b. Right to Remain Silent

Goodwin argues the trial court abused its discretion by admitting his statements into evidence because the State failed to: (i) show by a preponderance of the evidence that he voluntarily waived his right to remain silent; and (ii) scrupulously honor his invocation of his right to remain silent. We disagree.

### i. Preponderance of the Evidence

In order for an issue to be preserved for appellate review, it must have been raised to and ruled upon by the trial court. *State v. Turner*, 373 S.C. 121, 126 n. 1, 644 S.E.2d 693, 696 n. 1 (2007). Because this issue was never raised to the trial court, it is unpreserved for our review.

### ii. Failure to Honor Goodwin's Invocation of his Right to Remain Silent

In examining the record, we do not find an instance where Goodwin invoked his right to remain silent. Goodwin argues his statements during the audio-taped interrogation that he would listen and he wanted some time to think about a question, invoked his right to remain silent. We find when the statements are viewed in context, and with their surrounding dialogue, they do not indicate he invoked his right to remain silent. Accordingly, evidence supports the trial court's admission of the statements.

### c. Fruit of an Arrest without Probable Cause

■ Goodwin contends the trial court erred in admitting his statement into evidence because the statement was the fruit of an arrest unsupported by probable cause. We disagree.

■■ Generally, an arrest must be supported by probable cause to believe that a crime has been committed and that the person to be arrested committed the crime. *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). The standard for an arrest is probable cause, defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense. *Gerstein v. Pugh*, 420 U.S. 103, 111, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975).

Here, a cigar butt with Goodwin's DNA was discovered within inches of the point of entry to a house that had been burglarized. These facts and circumstances are sufficient to warrant a prudent person in believing Goodwin committed the burglary. Accordingly, evidence supports the trial court's findings and we find the trial court properly determined there was probable cause for Goodwin's arrest, and properly admitted his statements which arose therefrom.

### II. Mistrial

■ Goodwin asserts the trial court erred in denying his motion for mistrial because the State's closing argument impermissibly shifted the burden of proof regarding his statement. We disagree.

■■■■■ The decision to grant or deny a mistrial is within the sound discretion of the trial court. *State v. Stanley,* 365 S.C. 24, 33, 615 S.E.2d 455, 460 (Ct.App.2005). "The court's discretion will not be overturned on appeal absent an abuse of discretion amounting to an error of law." *Id.* The power of a court to declare a mistrial ought to be used with the greatest caution under urgent circumstances, and for very plain and obvious causes stated into the record by the trial court. *Id.* at 34, 615 S.E.2d at 460. "The granting of a motion for a mistrial is an extreme measure which should be taken only where an incident is so grievous that prejudicial effect can be removed in no other way." *Id.* "A mistrial should only be granted when 'absolutely necessary,' and a defendant must show both error and resulting prejudice in order to be entitled to a mistrial." *Id.* " 'The less than lucid test is therefore declared to be whether the mistrial was dictated by manifest necessity or the ends of public justice.' " *Id.* (quoting *State v. Prince,* 279 S.C. 30, 33, 301 S.E.2d 471, 472 (1983)). " 'Whether a mistrial is manifestly necessary is a fact specific inquiry.' " *Id.* (quoting *State v. Rowlands,* 343 S.C. 454, 457, 539 S.E.2d 717, 719 (Ct.App.2000)).

■■■■■ A trial court is allowed broad discretion in dealing with the range and propriety of closing argument to the jury. *State v. Condrey,* 349 S.C. 184, 195–96, 562 S.E.2d 320, 325 (Ct.App.2002). Ordinarily, the court's rulings on such matters will not be disturbed. *Id.* at 196, 562 S.E.2d at 325–26. An appellate court must review the argument in the context of the entire record. *State v. Patterson,* 324 S.C. 5, 17, 482 S.E.2d 760, 766 (1997). "The relevant question is whether the solicitor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.*

Here, the State's closing argument did not present the requisite urgent circumstances for a mistrial. The comment was not so grievous that its alleged prejudicial effect could not be removed in any other way. After reviewing the record in its entirety, we do not believe the solicitor's comments so infected the trial with unfairness as to make Goodwin's conviction a denial of due process. Moreover, any alleged error was cured by the trial court's extensive jury charge on voluntariness of statements, and the State's burden to prove voluntari-

ness of a statement beyond a reasonable doubt.[3] Accordingly, we find the trial court properly denied Goodwin's mistrial motion.

## CONCLUSION

For the foregoing reasons, we find the trial court did not err in admitting Goodwin's statements and properly denied Goodwin's mistrial motion. Accordingly, the trial court is

**AFFIRMED.**

THOMAS and GEATHERS, JJ., concur.

---

**3.** The trial court charged: "The State must prove the voluntariness of a statement beyond a reasonable doubt. If you determine beyond a reasonable doubt that a statement was given freely and voluntarily, then you may give the statement such further consideration as you deem proper."