# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Jermaine Marquel Bell, Appellant.

Appellate Case No. 2017-001500

---

Appeal From Chester County
Paul M. Burch, Circuit Court Judge

---

Opinion No. 5742
Heard March 10, 2020 – Filed July 8, 2020

---

### REVERSED

---

Appellate Defender David Alexander and Appellate Defender Sarah Elizabeth Shipe, both of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Deputy Attorney General Donald J. Zelenka, Senior Assistant Deputy Attorney General Melody Jane Brown, and Senior Assistant Attorney General W. Edgar Salter, III, all of Columbia; and Solicitor Randy E. Newman, Jr., of Lancaster, for Respondent.

---

**GEATHERS, J.:** Jermaine Bell appeals his conviction of murder, for which he was sentenced to life imprisonment. Bell argues the circuit court erred in allowing the decedent's husband and daughter to testify regarding statements purportedly made by the decedent indicating that she believed Bell was stealing from her. We reverse.

# FACTS

The decedent, Judy Lindsay, and her common law husband, Mitchell Mayfield, lived in Chester County. Judy and Mayfield had one son, two daughters, and several grandchildren. Their youngest daughter, Jessica, lived at home with Judy, Mayfield, and Jessica's children. The family was well known in their neighborhood, and people would often gather to socialize on the family's front porch. One such person was Jermaine Bell, who was friends with Jessica and her brother. The family had a unique relationship with Bell, as they often ran him off or told him not to come around, only to invite him over later or allow him back, oftentimes after he procured sodas or other drinks for the family.

During the weekend of Judy's death, Bell, who was transient, spent the night of Friday, September 11, 2015, on the family's couch. On Saturday, September 12, 2015, Bell was gone before anyone else woke up. That same day, Judy and Jessica attended a funeral before Judy went to church to sing with the choir. After returning from church, Judy changed into a pair of pants and a t-shirt. Judy joined Jessica, who had been drinking alcohol,[1] on the porch to smoke a cigarette. Mayfield also joined them on the porch before going to bed around 11:00 or 11:30 p.m.[2] At some point, Jessica telephoned Bell and invited him to join them on the porch. When Bell arrived, Jessica gave him a shot of liquor.

After socializing on the porch for a while, Jessica called her cousin and asked him to take her to get something to eat. When she returned about fifteen to twenty minutes later, Judy and Bell were still on the porch, and Bell was still drinking. Upon finishing her food, Jessica smoked a cigarette and went to bed around 12:30 or 12:45 a.m. As Jessica was heading to bed, Judy indicated that she was going to stay on the porch until she finished her cigarette. Bell was still on the porch with Judy when Jessica went to bed.

On Sunday, September 13, 2015, Mayfield woke up around 5:00 or 6:00 a.m. As part of his usual morning routine, Mayfield made himself some coffee, emptied his trash, and burned his trash in a burn barrel. Mayfield did not see Judy that morning, but assumed she was sleeping in the room with Jessica. However, while he was burning his trash, Mayfield noticed Judy's socks, shoes, and scarf were strewn

---

[1] Judy and Mayfield did not drink alcohol.

[2] Prior to going to bed, Mayfield and Judy got into an argument over whether Mayfield would attend a church event with her on Sunday and what he would wear. When Mayfield did go to bed, one of the couple's grandchildren slept in the bed with him.

around the yard. Believing that the grandkids had thrown Judy's clothes into the yard, Mayfield woke Jessica up and told her to get up and have the kids clean the yard.[3] Jessica asked Mayfield if he knew where Judy was, and Mayfield responded that he did not but indicated that Jessica should get up and try to locate Judy.

After waking up, Jessica went outside and began panicking when she could not find Judy. Jessica started calling family members to ask if they had seen Judy. Additionally, Jessica tried to call Bell because she knew he was the last person to see Judy. When that proved unsuccessful, Jessica and a family friend drove to Herman "Bo" Weldon's house, where Bell was supposedly staying, but no one answered the door. However, while on the porch, Jessica spotted the black shoes Bell had been wearing the night before and noticed that they were covered in mud. At some point, Jessica finally got a hold of Bell and asked if he knew what happened to Judy, to which Bell responded, "Ask Mango.[4]" Thereafter, Jessica returned home to continue looking.

When Mayfield and Jessica went back into the yard, Mayfield noticed what appeared to be drag marks. He attempted to follow the drag marks but could not follow them once they led into the tall grass. Mayfield then looked around the neighbor's yard and found one of Judy's shirts and her keys. At that point, Mayfield informed Jessica that he was calling the police.

Around 9:35 a.m., Officer John Kelly of the Chester County Sheriff's Office was dispatched to investigate a reported missing person. Officer Kelly arrived on the scene at 9:41 a.m. and was met by Mayfield and Jessica, who explained that Judy was last seen on the porch with Bell. Mayfield took Officer Kelly to the side of the house where he found Judy's clothes. Once in the yard, Officer Kelly noticed the drag marks, noting that they went through the dirt, around the back side of the house, and into the next-door neighbor's yard. Mayfield then offered to show Officer Kelly where he had found Judy's shirt and keys, but Officer Kelly decided to call for detectives and a dog. Officer Kelly taped off the crime scene and continued talking with Mayfield and Jessica.[5] At some point, Mayfield pointed out that Bell was walking down the street towards the crime scene, and Officer Kelly made contact

---

[3] On cross-examination, Jessica was presented with her earlier statement in which she indicated that she had woken herself up around 7:00 a.m. and subsequently roused Mayfield.

[4] "Mango" is Mayfield's nickname.

[5] The crime scene comprised Judy and Mayfield's house, their next-door neighbor's house, and an abandoned house on the other side of their neighbor.

with him.  Bell gave detectives his version of the night's events, indicating that he left the house after Judy went to bed around 12:30 or 1:00 a.m.  Bell then agreed to be interviewed, and a detective placed him in a squad car and transported him to the Chester County Sheriff's Office.[6]  Prior to the interview, Bell consented to a buccal swab.

Around 10:55 a.m., Officer Randy Clinton of the York County Sheriff's Office's K-9 Division received a call in reference to using a bloodhound to track a missing person.  Officer Clinton arrived on scene and "scented" the dog off a pair of Judy's socks.  The dog led Officer Clinton through Judy and Mayfield's yard, past their neighbor's house, around a fence and rosebush, past Judy's shirt and keys, and to the backyard of an abandoned house.  The dog continued to lead Officer Clinton to the back side of a tin storage shed behind the abandoned house.  Officer Clinton then found Judy's naked body lying face down behind the storage shed.

Following the discovery of Judy's body, the South Carolina Law Enforcement Division (SLED) was contacted to assist on the case.  Thereafter, three SLED agents arrived on scene at 1:31 p.m.  While on the scene, the SLED agents collected or marked multiple pieces of evidence, including Judy's orange t-shirt and several footwear impressions.  Additionally, the agents took a buccal swab from Mayfield.  After spending most of the day on site, law enforcement cleared the scene and took down the crime scene tape around 7:20 p.m.

After clearing the murder scene, law enforcement investigated several other locations, including Weldon's house.  Once there, officers collected a pair of black Coogi shoes based on Jessica's tip that they were the same shoes Bell had worn the night before.  However, by the time officers found the shoes, they were wet and appeared to have been washed.  Meanwhile, at the crime scene, Mayfield and his sister[7] were walking around the yard to see if they could find any more items.  Mayfield testified that while walking near the location where Judy's body was found, the two found a plastic bag filled with Judy's underwear and a missing ashtray.  Upon finding the bag, Mayfield contacted law enforcement, and SLED agents arrived back on scene around 8:27 p.m.  The items were then turned over to law enforcement, who did not find any latent fingerprints on the plastic bag or its contents.

---

[6] Law enforcement also had the grandchildren who were present at the house on the night of the murder sent to Safe Passage for a forensic interview.  However, the grandchildren were not able to provide any information regarding Judy's death.

[7] Mayfield testified that his sister used to work for a police department and he asked her if she thought it was ok to look around the scene after the tape was removed.

During Bell's interview at the Chester County Sheriff's Office, SLED Agent Lee Boan used several interview tactics in an attempt to gain information, including telling Bell that Judy had died of a heart attack and claiming that officers had matched Bell's DNA to evidence on scene. Despite Agent Boan's tactics, Bell maintained his innocence throughout the interview. However, during this interview and a follow-up interview conducted on September 15, 2015, Bell offered several inconsistent statements.

First, Bell claimed that he spent the night of Judy's death at two different houses before finally conceding that he spent the night on Weldon's porch. Second, Bell claimed that on the night of the murder, he stepped off the porch and walked directly down the road. Bell then indicated that he had gone into the side yard to urinate before leaving. Finally, officers asked Bell what he was wearing the night of the murder, and Bell indicated that he had worn a black shirt, jeans, and Coogi shoes. Bell further claimed that he had slept in his clothes and had not showered or changed before walking to the crime scene and agreeing to be interviewed. Despite these claims, Bell was not wearing the same clothes during the interview and ultimately claimed that he did change clothes and shower.

On September 14, 2015, Dr. Kim Collins conducted Judy's autopsy. Dr. Collins noted that Judy had an abrasion on her forehead and the area from Judy's collarbone up had a reddish-purple discoloration resulting from bruising. Dr. Collins indicated that such discoloration was consistent with manual strangulation, and swabs of Judy's neck area were taken to test for touch DNA. As she continued, Dr. Collins discovered blood in Judy's mouth resulting from Judy biting into the deep muscle of her tongue, scratches on the inside of her lips resulting from the pressure placed onto her teeth from her lips, and pinpoint hemorrhages on her inner lips resulting from ruptured blood vessels in her mouth. Additionally, Dr. Collins found hemorrhages in Judy's eyes as a result of ruptured blood vessels. Turning to the neck area, Dr. Collins discovered more hemorrhages in Judy's strap muscles, further indicating that the hemorrhages extended down through several layers of muscle.[8] Dr. Collins also found a massive amount of hemorrhaging on the deep tissue in the back of Judy's neck. Dr. Collins explained, "that's a lot of squeezing through the skin[,] through the underlying fat, through all those strap muscles and then to cause hemorrhage in the back of all these structures around the esophagus, that's very deep in the back of the neck." Based on the bruising and hemorrhaging in Judy's neck,

---

[8] Dr. Collins explained that such hemorrhages do not always appear when a victim has been strangled but their presence suggests a significant amount of pressure on the neck.

Dr. Collins determined Judy's cause of death to be homicide by manual strangulation and opined that Judy was strangled with "a great deal of force."

Dr. Collins further noted multiple areas of abrasion and bruises to different parts of the body. One such abrasion was a long, linear scratch from Judy's armpit area down to her thigh.[9] Dr. Collins also found a large area of abrasion on the left knee and an area of abrasion on the left buttock. Additionally, Dr. Collins found a large area of bruising on the inner aspect of the left arm near the elbow and similar bruising on the right arm, further indicating that the bruises were noticeable despite Judy's darkly pigmented skin. Dr. Collins opined that the bruising around Judy's armpits was consistent with being dragged and, after considering the knee abrasions, law enforcement concluded that Judy's body was dragged face down.

Dr. Collins also performed a sexual assault examination on Judy's body. Dr. Collins determined that Judy had an abrasion to her pubic area, a tear and scraping to the tissue on the outside of the vagina, and hemorrhaging in the tissue around the rectum. However, Dr. Collins did not find any injuries inside the vagina nor did she discover anything suggesting the presence of bodily fluids.

Bell was arrested on October 2, 2015, and the Chester County Grand Jury indicted him for murder on February 16, 2016. Bell's trial was conducted on June 26 through June 30, 2017. At trial, Bell twice objected to the admission of testimony at issue on appeal. First, Bell raised the following objection to Mayfield's testimony:

> **State:** "Now, getting closer to the time of September 2015, had any other problems arose regarding the defendant, Jermaine Bell, between you and your wife, Judy?"
>
> **Mayfield:** "No. Now, at a point in time they - - Judy had told me Jermaine was stealing."
>
> **State:** "Someone was stealing?"
>
> **Defense:** "Objection, Your Honor."
>
> **State:** "Goes to the state of mind, Your Honor."
>
> **Defense:** "404-B."

---

[9] Officers theorized that this abrasion occurred as Judy was being dragged past the rose bush.

**Court:** "I'm going to give her a little leeway on it, I will overrule the objection. Go ahead."

Mayfield went on to testify that Judy believed Bell was stealing glasses, money, cigarettes, and clothes from her. However, Mayfield also testified that they had no proof that Bell was stealing and they never reported it to the police.

Similarly, Bell raised the following objection to Jessica's testimony:

**State:** "Had she ever explained to you about anything that he had done?"

**Jessica:** "Yeah, stealing stuff from her."

**Defense:** "Objection, Your Honor, same as before, 403."[10]

**State:** "Goes to the state of mind, Your Honor."

**Court:** "Overruled."

Jessica went on to testify that Judy believed Bell was stealing her glasses and underwear but indicated that no one had confronted Bell or called the police about the issue. Notably, the circuit court did not provide a rationale in overruling either objection.

Following the testimony of Mayfield and Jessica, the State presented several witnesses who saw Bell on the night of the murder or the following morning. First, Detective Brian Sanders testified without objection regarding a statement given by one of Jessica's friends. According to the friend, she had driven over to the house around 12:30 a.m. on the night of the murder to pick Jessica up so they could go out. She claimed that she blew the horn, nobody came to the door, the lights were off, the TV was on, and the front door was open. She further claimed that Bell came walking from a house across the street and indicated he did not know the location of Jessica or Judy when asked.

Second, Weldon testified that he woke up around 7:00 a.m. on September 13, 2015, to find Bell sleeping on the couch on his porch. Weldon walked to the store

---

[10] We note the circuit court likely interpreted "same as before" to mean that Bell was objecting under Rule 404(b), SCRE, which he invoked in objecting to Mayfield's testimony regarding Judy's statements.

to buy cigarettes and shared one with Bell when he returned. Weldon claimed that he and Bell did not really talk but that Bell kept going back and forth to the road.

Next, Mayfield's nephew, Darkarious Woods, testified that he was driving by Judy and Mayfield's house around 1:00 or 1:30 a.m. on the night of the murder. Woods claimed that he saw Bell coming from the side yard between the house neighboring Judy's and the abandoned house behind which Judy's body was found. According to Woods, Bell walked up to his car and asked if it was new. Woods explained that he found this question odd because Bell had previously washed his car multiple times. Woods further testified that Bell seemed "jittery" during their conversation.

Finally, Ervin Chalk testified that he had known Bell for a year or two and that Bell lived in the abandoned house across the street from his. Chalk indicated that on the day of the murder, he and Bell had attended the same birthday party at Chalk's aunt's house. Chalk claimed that Bell was drinking at the party, was wearing a blue and white striped shirt, and had left around 10:00 or 11:00 p.m. Chalk testified that he went to a club after leaving the party but on his way home around 3:30 a.m., he saw Bell walking in the direction of Weldon's house and wearing the same blue and white striped shirt he had worn to the party.

The State then presented several experts.[11] First, the State offered Jessica Stowe as an expert in forensic serology. Stowe explained that while looking at oral, vaginal, and rectal swabs from Judy's body, she detected the presence of P30, a protein found in high concentrations in male seminal fluid. However, Stowe testified that she could not identify any spermatozoa from the swabs. Stowe forwarded the swabs testing positive for P30 to SLED's DNA section but the record does not reveal whether the P30 samples underwent DNA analysis or what results, if any, were obtained. Additionally, Stowe explained that she scraped and swabbed the underarms of Judy's orange t-shirt for touch DNA. Stowe also forwarded these swabs to SLED's DNA section.

Following Stowe, the State offered Lilly Gallman as an expert in DNA analysis. Gallman testified that the swabs taken from Judy's neck contained a mixture of DNA from two individuals and indicated that Judy and Bell could not be excluded as contributors to the mixture. Gallman explained that the probability of

_____

[11] These experts included SLED Agent Melinda Worley, an expert in shoe wear impression. However, Agent Worley testified that she was not able to conclude that Bell's black Coogi shoes made the prints on scene nor was she able to conclude that Bell's shoes did not make the prints on scene.

selecting an unrelated individual who could have contributed to the mixture was one in ten.[12]  Gallman testified that she also conducted a YSTR-DNA test on the swabs, further explaining that a YSTR-DNA test focuses only on the Y-chromosome. Gallman indicated that the YSTR test from the swabs "matched" Bell's Y-DNA and the probability of randomly selecting an unrelated male individual having a matching DNA profile was one in 8,600.[13]  Furthermore, Gallman asserted that the Y-DNA "matched" Bell's DNA profile to a reasonable degree of scientific certainty.

After testing the swabs from Judy's neck, Gallman tested the swabs taken from the underarms of Judy's shirt.  Gallman determined that these swabs contained a mixture of DNA and that Judy and Bell could not be excluded as contributors to the mixture.  Gallman indicated that the probability of selecting an unrelated individual who could have contributed to the mixture was one in 960.[14]  Gallman then performed a YSTR test on the underarm swabs and determined the swabs "matched" Bell's Y-DNA and the probability of randomly selecting an unrelated male individual having a matching DNA profile was one in 8,600.  Conversely, Gallman determined that, to a reasonable degree of scientific certainty, Mayfield could be excluded as a contributor to the neck and shirt swabs under both the standard DNA and Y-DNA tests.  However, Gallman testified that she analyzed Judy's fingernail clippings and determined that Bell could be excluded as a minor DNA contributor but Mayfield could not.

During its closing arguments, the State made the following references to the testimonies of Mayfield and Jessica:

> Now I'm going to talk about that bag and the ashtray that was found.  Remember, they were saying that Mitchell Mayfield and Jessica, that some of their mother's items had been missing and she believed that [Bell] was stealing from them, Judy did, and so did Jessica.

---

[12] Gallman explained that the statistical frequency of the DNA was high because she was only able to analyze two out of sixteen loci on the chromosome.

[13] Gallman explained that all males sharing the same paternal lineage would share the same Y-DNA.  Therefore, any such male would be a match under the YSTR-test. However, Bell stipulated that his brother was working on the night of the murder and was not present at the home of the victim.

[14] Gallman testified that she was only able to analyze four out of sixteen loci on the chromosome.

. . .

[Jessica] said Judy believed the defendant was stealing some of her personal items; glasses, underwear[,] ashtray. I'm going to tell you something, after I got this case it was already too late, but I even went back over here to see this area for myself. I wish someone had gone back and looked even a little harder, you might have found a pair of glasses in there. I submit to you this defendant had his own little spots to hang out[,] to put stuff, to hide stuff. Her clothing could be anywhere in this area. He knows the woods, he knows the back trail, he knows the abandoned houses, he knows every single corner of that.

. . .

Whoever killed Judy knew where to hide her body. Abandoned home, overgrown. . . . This was his hiding place, that's where the underwear was, that's where the ashtray was.

. . .

[Judy] probably confronted [Bell] about her stolen items, maybe she was just sick of it, unfortunately we will never know because he killed her. Maybe it was a sexual rejection . . . .

Ultimately, the jury found Bell guilty of murder, and the circuit court sentenced Bell to life imprisonment. Bell then moved for a new trial, but the motion was denied. This appeal followed.

### ISSUE ON APPEAL

Did the circuit court err in allowing Mayfield and Jessica to testify regarding Judy's statements indicating she believed Bell was stealing from her?

### STANDARD OF REVIEW

"In criminal cases, the appellate court sits to review errors of law only." *State v. Wharton*, 381 S.C. 209, 213, 672 S.E.2d 786, 788 (2009). As such, "[appellate

courts are] bound by the [circuit] court's factual findings unless they are clearly erroneous." *State v. Baccus*, 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006).

"A [circuit court] has considerable latitude in ruling on the admissibility of evidence . . . ." *State v. Kelley*, 319 S.C. 173, 177, 460 S.E.2d 368, 370 (1995). Accordingly, "[t]he admission of evidence is within the discretion of the [circuit] court and will not be reversed absent an abuse of discretion. An abuse of discretion occurs when the conclusions of the [circuit] court either lack evidentiary support or are controlled by an error of law." *State v. Goodwin*, 384 S.C. 588, 601, 683 S.E.2d 500, 507 (Ct. App. 2009) (quoting *State v. Pagan*, 369 S.C. 201, 208, 631 S.E.2d 262, 265 (2006)).

"The improper admission of hearsay is reversible error only when the admission causes prejudice." *State v. Hughes*, 419 S.C. 149, 155, 796 S.E.2d 174, 177 (Ct. App. 2017) (quoting *State v. Weston*, 367 S.C. 279, 288, 625 S.E.2d 641, 646 (2006)). Additionally, "[a circuit court]'s decision regarding the comparative probative value and prejudicial effect of relevant evidence should be reversed only in exceptional circumstances." *State v. Sweat*, 362 S.C. 117, 129, 606 S.E.2d 508, 514 (Ct. App. 2004). Finally, "[i]f there is any evidence to support the admission of[] bad act evidence, the [circuit court]'s ruling will not be disturbed on appeal." *State v. Wilson*, 345 S.C. 1, 6, 545 S.E.2d 827, 829 (2001).

## LAW/ANALYSIS

Bell argues the circuit court erred in allowing Mayfield and Jessica to testify regarding Judy's statements indicating she believed Bell was stealing from her because 1) the statements constituted inadmissible hearsay and did not fall within the "Then Existing Mental, Emotional, or Physical Condition" exception to the rule against hearsay; 2) the risk of unfair prejudice stemming from the statements outweighed their probative value; and 3) the statements constituted evidence of prior bad acts precluded by Rule 404(b), SCRE.

Prior bad acts and Rule 404(b)[15]

---

[15] Bell's remaining arguments are unpreserved for appellate review because they were not raised to and ruled upon by the circuit court or were not raised with sufficient specificity. *See Staubes v. City of Folly Beach*, 339 S.C. 406, 412, 529 S.E.2d 543, 546 (2000) ("It is well-settled that an issue . . . must have been raised to and ruled upon by the [circuit] court to be preserved for appellate review."); *State v. Patterson*, 324 S.C. 5, 19, 482 S.E.2d 760, 767 (1997) (indicating an "[a]ppellant is

Bell argues the circuit court erred in allowing Mayfield and Jessica to testify regarding Judy's statements because the statements constituted evidence of prior bad acts and were thus inadmissible under Rule 404(b).  The State argues the statements did not constitute evidence of prior bad acts but, rather, constituted evidence of the suspicion of prior bad acts.  We agree with Bell.

Pursuant to Rule 404(b), SCRE,

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible to show motive, identity, the existence of a common scheme or plan, the absence of mistake or accident, or intent.

In other words, "evidence of prior bad acts is inadmissible to show criminal propensity or to demonstrate the accused is a bad person." *State v. King*, 334 S.C. 504, 512, 514 S.E.2d 578, 582 (1999).  Our courts have explained that, "[p]roof that a defendant has been guilty of another crime equally heinous prompts to a ready acceptance of and belief in the prosecution's theory that he is guilty of the crime charged." *State v. Lyle*, 125 S.C. 406, 416, 118 S.E. 803, 807 (1923).  Thus, the effect of such evidence "is to predispose the mind of the juror to believe the [defendant] guilty, and thus effectually to strip him of the presumption of innocence." *Id*.  Consequently, "[t]o be admissible, the bad act must logically relate to the crime with which the defendant has been charged." *State v. Fletcher*, 379 S.C. 17, 23, 664 S.E.2d 480, 483 (2008).  Moreover, "[i]f the defendant was not convicted of the prior crime, *evidence of the prior bad act must be clear and convincing*." *Id*. (emphasis added).

At the outset, the State argues the statements did not constitute evidence of prior bad acts but, rather, constituted evidence of a belief or suspicion of prior bad acts.  We disagree for the following reasons.  First, Judy's belief that Bell was stealing was, at minimum, evidence of two things: 1) Judy believed her property was stolen or lost; and 2) something led Judy to believe Bell was responsible.  Thus, we find the State elicited Judy's belief that Bell was stealing to demonstrate that Bell

---

limited to the grounds raised at trial"); *see also State v. Johnson*, 363 S.C. 53, 58, 609 S.E.2d 520, 523 (2005) ("The objection should be addressed to the [circuit] court in a sufficiently specific manner that brings attention to the exact error."); *State v. Dunbar*, 356 S.C. 138, 142, 587 S.E.2d 691, 694 (2003) ("[T]o preserve [a legal issue], []it must be clear that the argument has been presented on that ground.").

had previously stolen from her. *Cf. Smalls v. State*, 422 S.C. 174, 185–86, 810 S.E.2d 836, 842 (2018) (finding that after the officer indicated on cross-examination that a prior burglary involving a stolen gun had not been solved, the State's question asking whether the defendant had burglarized the house "did not serve any legitimate purpose" but "was an improper effort to introduce evidence that Smalls committed another crime"). Second, in its closing argument, the State portrayed Judy's belief as conclusive evidence that Bell had been stealing from her and asserted that the prior thefts were evidence of Bell's possible motives. Notably, evidence of motive is one of the five exceptions to the rule precluding the admission of prior bad acts evidence. *See* Rule 404(b), SCRE ("Evidence of other crimes, wrongs, or acts . . . may[] be admissible to show motive . . . .").

Finally, if this court were to accept the State's distinction between evidence of prior bad acts and evidence of the *belief* of prior bad acts, such a distinction would swallow Rule 404(b)'s preclusion of prior bad acts evidence. Pursuant to the State's position, Rule 404(b) would not preclude evidence of a belief of prior bad acts, thus, the State would not need to invoke an exception to the rule to have such evidence admitted. Moreover, under the State's position, evidence that a defendant committed an unconvicted prior bad act would require proof of the act by clear and convincing evidence, but evidence *that someone believes* a defendant committed an unconvicted prior bad act would not be subject to the same evidentiary burden. *See Fletcher*, 379 S.C. at 23, 664 S.E.2d at 483 ("If the defendant was not convicted of the prior crime, *evidence of the prior bad act must be clear and convincing*." (emphasis added)). If this court were to sanction such a distinction, the State could bypass the rule, as well as 404(b) scrutiny when invoking an exception to the rule, by simply having witnesses testify that they believe a defendant committed a prior bad act rather than putting forth direct evidence of the prior bad act in question. Thus, we conclude that Mayfield's and Jessica's statements constitute evidence of prior bad acts, and we will scrutinize the circuit court's admission of the statements accordingly.

In *State v. Fletcher*, our supreme court found that the circuit court erred in allowing the State to present evidence of prior bad acts in a homicide by child abuse case. 379 S.C. at 25, 664 S.E.2d at 483–84. At trial, the State called one of the defendant's friends and coworkers to testify regarding two events involving the child victim. *Id*. at 21, 664 S.E.2d at 481. Both co-defendants objected to the testimony, arguing there was not clear and convincing evidence establishing who committed the acts in question. *Id*. at 21, 664 S.E.2d at 481–82. The circuit court overruled the objection and allowed the witness to testify. *Id*. at 21, 664 S.E.2d at 482. The witness testified that on one occasion, he had gone to the co-defendants' house and heard a baby crying. *Id*. After going upstairs, he found the child sitting in a walker

in the attic and profusely sweating. *Id*. On another occasion, the witness indicated he had gone to the co-defendants' house and found the child handcuffed by his feet to the co-defendants' bed. *Id*. at 22, 664 S.E.2d at 482.

On appeal, our supreme court found that, "there is simply not clear and convincing evidence in the record that Fletcher committed the prior bad acts testified to by [the witness]." *Id*. at 24, 664 S.E.2d at 483. The court explained that, "[a]lthough [the witness] testified he saw [the child] handcuffed to the bed and in the walker in the attic, there was no evidence whatsoever introduced at trial that Fletcher was either the person who placed [the child] in the attic[] or that he handcuffed him to the bed." *Id*. Ultimately, the court held that the circuit court erred in admitting the witness's testimony, concluding "there is simply no evidence, let alone clear and convincing evidence[,] that Fletcher was the perpetrator of the prior bad acts against [the child]."[16] *Id*. at 25, 664 S.E.2d at 483–84.

Here, we find the circuit court abused its discretion in allowing Mayfield and Jessica to testify regarding Judy's statements because there is no evidence, let alone clear and convincing evidence, demonstrating that Bell had previously stolen Judy's property. *See Goodwin*, 384 S.C. at 601, 683 S.E.2d at 507 ("An abuse of discretion occurs when the conclusions of the [circuit] court either lack evidentiary support or are controlled by an error of law." (quoting *Pagan*, 369 S.C. at 208, 631 S.E.2d at 265)). Mayfield and Jessica both testified that Judy believed Bell was stealing from her but indicated that the family had no proof of this, had not called the police, and had not confronted Bell about the alleged thefts. Assuming some of Judy's property

---

[16] Consistent with the holding in *Fletcher*, our courts have routinely held that a circuit court errs by admitting evidence of prior bad acts when the defendant cannot be established as the perpetrator of the bad acts by clear and convincing evidence. *See State v. Cutro*, 332 S.C. 100, 106, 504 S.E.2d 324, 327 (1998) ("[H]ere, the evidence is insufficient to establish that appellant was the actor in Parker's death or Asher's injuries[,] and we hold the trial judge erred in admitting this evidence."); *State v. Pierce*, 326 S.C. 176, 178, 485 S.E.2d 913, 914 (1997) ("The State failed to offer any proof that appellant inflicted these injuries. Thus, this testimony is inadmissible under *Lyle*[,] and the trial court erred in admitting it."); *State v. Conyers*, 268 S.C. 276, 281, 233 S.E.2d 95, 97 (1977) ("There was very little evidence, however, to establish that appellant poisoned her first husband other than the fact that she was his wife and he had some life insurance. This evidence alone was insufficient to establish the identity of appellant as the actor in poisoning her first husband. The admission of this testimony was clearly prejudicial and requires that a new trial be granted.").

had been stolen, we find this case is similar to *Fletcher* because neither Mayfield's nor Jessica's testimony could definitively establish that Bell was the perpetrator of the thefts. *See Fletcher*, 379 S.C. at 25, 664 S.E.2d at 483–84 ("[T]here is simply no evidence, let alone clear and convincing evidence[,] that Fletcher was the perpetrator of the prior bad acts . . . ."). Moreover, unlike the acts in *Fletcher*, there is no evidence, beyond her statements of belief, that Judy's property had in fact been stolen. There is no evidence in the record indicating that the clothes in the bag Mayfield testified he found are the same clothes Judy alleged were stolen. Additionally, neither Mayfield nor Jessica testified that Judy believed Bell had stolen the ashtray found in the bag. Accordingly, we do not find clear and convincing evidence demonstrating that Bell was the perpetrator of the alleged thefts. *See id.* at 23, 664 S.E.2d at 483 ("If the defendant was not convicted of the prior crime, *evidence of the prior bad act must be clear and convincing*." (emphasis added)). Thus, the circuit court erred in admitting the evidence of prior bad acts.

Harmless error

The State argues that any error in admitting Mayfield's and Jessica's testimonies was harmless beyond a reasonable doubt. We disagree.

An "[e]rror is harmless when it 'could not reasonably have affected the result of the trial.'" *State v. Mitchell*, 286 S.C. 572, 573, 336 S.E.2d 150, 151 (1985) (quoting *State v. Key*, 256 S.C. 90, 93, 180 S.E.2d 888, 890 (1971)). "No definite rule of law governs this finding; rather, the materiality and prejudicial character of the error must be determined from its relationship to the entire case." *State v. Thompson*, 352 S.C. 552, 562, 575 S.E.2d 77, 83 (Ct. App. 2003) (quoting *Mitchell*, 286 S.C. at 573, 336 S.E.2d at 151). Accordingly, "our jurisprudence requires us not to question whether the State proved its case beyond a reasonable doubt, but *whether beyond a reasonable doubt the trial error did not contribute to the guilty verdict*." *State v. Tapp*, 398 S.C. 376, 389–90, 728 S.E.2d 468, 475 (2012) (emphasis added). In other words, an error is harmless "when guilt has been conclusively proven by competent evidence *such that no other rational conclusion can be reached*." *State v. Kirton*, 381 S.C. 7, 37, 671 S.E.2d 107, 122 (Ct. App. 2008) (emphasis added).

In *State v. King*, our supreme court found the erroneous admission of prior bad acts evidence constituted reversible error. 334 S.C. at 514–15, 514 S.E.2d at 583–84. King was accused of the murder of his father-in-law. *Id.* at 507–09, 514 S.E.2d at 579–81. At trial, King's ex-wife testified regarding prior incidents in which King had stolen items from her. *Id.* at 511, 514 S.E.2d at 582. On appeal, the supreme court found the circuit court erred in admitting the prior bad acts evidence

because the evidence was "not admissible under any theory." *Id*. at 513, 514 S.E.2d at 583.

In concluding that the error was not harmless, the supreme court determined that all of the evidence in the record was circumstantial. *Id*. at 514, 514 S.E.2d at 583. The court further found that, "[w]hile this circumstantial evidence pointed to appellant's guilt, especially the blood evidence, the evidence *was not overwhelming*." *Id*. (emphasis added). The court explained that "[t]he admission of this testimony allowed the State to insinuate to the jury that appellant had a drug problem[,]" and "[t]he [State]'s questions eliminated many legitimate reasons why appellant would need money." *Id*. "This improper evidence suggested to the jury that appellant was guilty of committing the charged crimes because of his criminal propensity to commit crimes and his bad character." *Id*. at 514, 514 S.E.2d at 583–84. Additionally, the court noted that "[t]he State *continuously stressed this improper testimony in its closing argument*." *Id*. at 514–15, 514 S.E.2d at 584 (emphasis added). "Therefore, it [wa]s *impossible* under these circumstances *to conclude the improper evidence did not impact the jury's verdict*." *Id*. at 515, 514 S.E.2d at 584 (emphases added). Finally, the court determined that the "improper testimony permeated the trial and the jury likely used this evidence to infer that since appellant had previously stolen from his ex-wife, he probably committed these crimes against his father-in-law also." *Id*.

We find the case at bar is strikingly similar to *King*. Here, like in *King*, all of the evidence in the record was circumstantial. Additionally, while we are cognizant of the fact that this circumstantial evidence pointed to Bell's guilt, such evidence was not overwhelming.[17] Given this evidentiary context, we find Mayfield's and Jessica's

---

[17] In asserting that the error was harmless, the State relies heavily on Gallman's testimony indicating the touch DNA taken from Judy's neck and the underarms of her shirt "matched" Bell's Y-DNA. However, we note that a "match" is only part of the equation in DNA analysis. "After determining that two DNA samples match, forensic analysts estimate the statistical frequency of such matches in a reference population. The purpose of the statistical estimates is to provide meaning to the match by showing the likelihood that an unrelated person in the reference population would match by chance." William C. Thompson, *Evaluating the Admissibility of New Genetic Identification Tests: Lessons from the "DNA War"*, 84 J. Crim. L. & Criminology 22, 61 (1993); *see also State v. Phillips*, Op. No. 27978 (S.C. Sup. Ct. filed June 3, 2020) (Shearouse Adv. Sh. No. 22 at 29–30) ("Random match probability is the likelihood that another randomly chosen person—unrelated to the suspect—will have a DNA fragment identical to the fragment the analyst found in

statements regarding Judy's belief were highly prejudicial. First, like the testimony in *King*, the statements tended to establish Bell's criminal propensity by painting him as a thief. *See id*. at 514, 514 S.E.2d at 583–84 ("This improper evidence suggested to the jury that appellant was guilty of committing the charged crimes because of his criminal propensity to commit crimes and his bad character."); *Lyle*, 125 S.C. at 416, 118 S.E. at 807 ("[The] effect [of bad acts evidence] is to predispose the mind of the juror to believe the [defendant] guilty, and thus effectually to strip him of the presumption of innocence."). Second, the statements allowed the State to insinuate to the jury that Bell was a pervert. *See King*, 334 S.C. at 514, 514 S.E.2d at 583 ("The admission of this testimony allowed the State to insinuate to the jury that appellant had a drug problem."). Because Judy's body was found unclothed and with injuries to the vaginal and rectal areas of her body, the insinuation that Bell was a

---

the touch sample."). Crucially, "[o]ne very important thing to understand about touch DNA is that in many cases . . . the DNA analyst is not able to obtain a full DNA profile from the 'touch' sample." *Phillips*, (Shearouse Adv. Sh. No. 22 at 28). Therefore, "[t]he probability of a random match in any given case depends on the size of the fragment the analyst can obtain from the touch sample." *Id*. at 30. "Thus, the more complete the fragment, the less likely another person could randomly match it. The *smaller the fragment*, on the other hand, *the more likely some other person will also have the identical fragment*, and would then be a 'random match.'" *Id*. (emphases added). Here, the State's DNA expert testified that when examining the DNA sample from Judy's neck, the expert was only able to analyze two out of the chromosome's sixteen loci. Similarly, when analyzing the DNA sample from Judy's underarms, the State's expert was only able to analyze four of the chromosome's sixteen loci. The expert further testified that the probability of selecting an unrelated individual with a matching DNA profile ranged from *one in ten* to *one in 960*. Additionally, the expert testified that the probability of randomly selecting an unrelated male individual with a matching Y-DNA profile was *one in 8,600*. We do not find that the statistical frequencies associated with Bell's DNA and Y-DNA tests were so low as to suggest that Bell's guilt was the only rational conclusion to be drawn from the evidence. *See, e.g.*, *Thompson*, 352 S.C. at 556–57, 575 S.E.2d at 80 ("The expert further opined that only *one in thirty-two quadrillion* persons have the same genetic marker as Thompson." (emphasis added)). Rather, a jury could have reasonably determined that the statistical frequencies did not reliably identify Bell as the source of the DNA or Y-DNA on Judy's neck and shirt. *See State v. Dinkins*, 319 S.C. 415, 418, 462 S.E.2d 59, 60 (1995) ("The jury should be allowed to make its own determination as to whether it believes the [DNA] statistics are reliable. The jury is free to believe or disbelieve the experts and the statistics.").

pervert tended to suggest that Bell was capable of and likely engaged in a sexually charged attack. In turn, this allowed the State to compensate for the absence of any evidence connecting Bell to the sexual injuries. Third, the statements allowed the State to establish potential motives for the killing despite Bell's friendly relationship with Judy and her family. In fact, in its closing argument, the State relied on Judy's belief as evidence of Bell's potential motive, asserting that Bell may have killed Judy after she confronted him about the alleged stolen items or after rejecting Bell's sexual advances.

But perhaps the most prejudicial effect was the establishment of a connection between Bell and the bag of Judy's underwear Mayfield testified he found on the scene. During the trial, law enforcement testified that they did not find any latent fingerprints on the bag or its contents, nor did they find anything that would directly tie Bell to the bag. However, despite the lack of proof that Bell was stealing, Mayfield's and Jessica's testimonies tied Bell directly to the bag of underwear. Because the bag was purportedly found near the location of Judy's body, this connection tended to place Bell at the scene and suggested that he was familiar with the area in which the body was found. Moreover, in its closing argument, the State again used the statements against Bell, consistently asserting that the items in the bag were the ones Judy believed Bell had stolen, that Bell in fact stole these items, and that Bell had "hiding spots" behind the abandoned house.

Ultimately, we find the statements that Judy believed Bell was stealing from her, which could not be proven or disproven, had the same prejudicial effect as evidence that would have conclusively established that Bell was stealing. In other words, even if Judy was mistaken in her belief that Bell was stealing, her statements would have still prejudiced him as if he had been. Furthermore, these statements were extremely prejudicial because they provided possible motives for the murder, connected Bell to the bag of underwear and Judy's injuries, and demonstrated Bell's criminal propensity. Moreover, because the State continuously stressed the improper statements in its closing argument, "it is impossible under these circumstances to conclude the improper evidence did not impact the jury's verdict." *King*, 334 S.C. at 515, 514 S.E.2d at 584; *see also Phillips*, (Shearouse Adv. Sh. No. 22 at 39) ("If there were any possibility we might find the error of admitting the [testimonies] harmless, the assistant solicitor extinguished that possibility with her incorrect statements in her closing argument."). Therefore, we find the error in admitting Mayfield's and Jessica's testimonies concerning the alleged prior bad acts was highly prejudicial and requires that Bell's conviction be reversed.

## CONCLUSION

Based on the foregoing, Bell's conviction is

**REVERSED.**

**LOCKEMY, CJ., and HEWITT, J., concur.**